IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

----------------------

No. 00-12001

----------------------

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APR 30, 2001
THOMAS K. KAHN
CLERK

D.C. Docket No. 99-01326-CV-EBD

SIREN, INC.,

Plaintiff-Appellee,

versus

ESTES EXPRESS LINES,

Defendant-Appellant.

----------------------------------------
Appeal from the United States District Court
for the Southern District of Florida
----------------------------------------
(April 30, 2001)

Before CARNES and MARCUS, Circuit Judges and HAND[1], District Judge.

---

[1] The Honorable W.B. Hand, District Judge, Southern District of Alabama, sitting by designation.

HAND, District Judge:

This matter is before the Court on the Appeal of Estes, a motor carrier, from the district court's order granting a directed verdict in favor of Siren, the shipper, in the amount of $46,982.16. The issue on appeal is whether the parties agreed in writing to limit the liability of Estes in accordance with 49 U.S.C. §14706(c)(1)(A). We conclude the parties did make such an agreement, and Estes' liability is limited to $8,309.00. Accordingly, the district court is due to be REVERSED. The district court's order granting Siren's motion for a directed verdict is VACATED and this matter is REMANDED to the district court with instructions to modify the final judgement in favor of Siren to reflect a recovery in the amount of $8,309.00.

**FINDINGS OF FACT**

On April 16, 1998, Estes picked up Siren's 700 pound shipment of razor blades in Miami, Florida for transport to Dunn, North Carolina. The bill of lading was prepared by the shipper, Siren. The bill of lading contained very little information other than the absolute essentials (shipper's name, consignee's name, carrier's name, the destination, a brief description of the commodities). However, the shipper indicated twice that the commodities should travel under "Class 85".

At trial, Estes introduced uncontroverted evidence that "Class 85" was

understood throughout the trucking industry to mean, among other things, that the carrier's liability would be limited to $11.87 per pound.[2] Estes maintains a tariff which specifically states that a "Class 85" shipment will limit Estes' liability to $11.87 per pound. Siren received, and knew that it received, an average discount from motor carriers of approximately 60% off of their full freight rates. For this particular shipment, Siren was aware that it received a freight rate which was discounted 62% from Estes' full freight rate. Siren knew the designation "Class 85" would be used by Estes to determine the freight rate. Siren could have chosen a different Class for this shipment and, in return, received a different rate along with a different limitation of Estes' liability. Siren never asked for and never received a copy of Estes' tariff.

Estes lost the shipment and offered to pay Siren $8,309, which is equal to 700 lbs X $11.87/lb. Siren sued Estes for recovery of the full value of the commodity ($46,982.16). After hearing all the evidence during a jury trial, the district court rendered a directed verdict in favor of Siren for $46,982.16, finding that "there [was] no showing that Plaintiff knew or reasonably should have known that the Class 85

---

[2]Although this Court believes the testimony on this point could have been further clarified, Siren did not contest this evidence at trial, and for the purposes of this case "Class 85" does indeed universally carry with it a limitation of liability aspect. (A witness for Estes testified that "Class 85" determines "the freight charge you can charge and the maximum liability in the event of loss, damage or delay." He further testified that "Class 85" would mean the same thing to any trucking company in America as it does to Estes. According to Estes, "Class 85" means, in part, that there is a limitation of liability equal to $11.87 per pound. This testimony was not refuted by Siren.)

designation carried with it the limitation of liability set forth in Defendant's tariff."[3]

However, it is important to point out that this finding of fact by the district court is not determinative of the legal issue in this case, because we find as a matter of law that even if Siren did not know of the terms of the Estes tariff, Estes had a right to rely on the limitation of liability aspect of the term "Class 85" used by Siren. Based on the above stated facts, and for the reasons set forth below, the order of the district court is due to be VACATED.

# CONCLUSIONS OF LAW

---

[3]For the purposes of our determination here, this Court does not need to decide whether the district court clearly erred in finding that there was no showing Siren "reasonably should have known that the Class 85 designation carried with it the limitation of liability set forth in Defendant's tariff". However, we do find the following evidence can be considered in determining whether Siren *should have known* the Estes tariff would have a limitation of liability corresponding with the designation "Class 85": (1) Siren is an experienced shipper; (2) Siren knew "Class 85" would determine the freight rate charged by Estes; (3) Siren knew Estes discounted the freight rate by more than 60% (despite the fact that Siren admittedly is not a large or bulk shipper); (4) Siren had previously shipped goods under a different classification and understood that *that* classification incorporated a limitation of liability (or "release rate"). (Although this evidence does not prove Siren knew about the terms of the Estes tariff, it is certainly at least *evidence* which would tend to prove that Siren *should have known*.)

The reason we do not need to determine whether the district court's finding on this point was clearly erroneous is because the legal issue is not whether Siren knew (or should have known) about the terms of the Estes tariff. The issue is whether Siren limited the liability of Estes when Siren used the term "Class 85" in its bill of lading. As we noted in footnote 2, for the purposes of this case, "Class 85" means, in part, that the liability of the carrier is limited. Thus it is not critical to this case whether Siren had knowledge of the Estes tariff because the term "Class 85" limited Estes' liability without assistance from the Estes tariff.

When the district court entered its directed verdict in favor of Siren, it focused its attention on whether the bill of lading incorporated by reference the Estes tariff. Indeed most of the parties' arguments to this Court focus on that very issue. That, however, is not the only issue in this case. Obviously, if Siren did incorporate the Estes tariff into the bill of lading, then Estes would prevail because the limitation of liability is found within that tariff. On the other hand, if Siren did not incorporate the Estes tariff into the bill of lading, does this necessarily mean that there is no limitation of liability? The district court would answer this question in the affirmative but this Court disagrees.

The applicable law is found at 49 U.S.C. §14706. As a general rule, when a motor carrier loses or injures the property it is carrying the carrier is liable for "the actual loss or injury to the property." 49 U.S.C. §14706(a)(1). However, there is an exception to this general rule found at 49 U.S.C. §14706(c)(1)(A), which allows a carrier to limit its liability "to a value established by . . . written agreement between the carrier and shipper. . . ."

One way a carrier and shipper might agree in writing to a limitation of liability is if a) the *carrier* prepares a bill of lading which incorporates the carrier's tariff by reference, b) that tariff contains an applicable limitation of liability provision and c) the shipper agrees to and signs the bill of lading. See e.g., Atwood, v. U W Freight

5

Line, Inc., 127 F.Supp. 2d 1155 (D. Idaho 1999). Likewise, the *shipper* might prepare a similar bill of lading that the parties agree to and sign. See e.g., Nieman Marcus Group, Inc., v. Quast Transfer, Inc., 1999 WL 436589 (N.D. Ill.); Mechanical Technology Inc., v. Ryder Truck Lines, Inc., 776 F.2d 1085 (2d. Cir. 1985).

Surely, the concept of a carrier and shipper who agree in writing to limit the carrier's liability is not bounded by a requirement that the carrier's tariff somehow be incorporated into the bill of lading. The statute merely requires that the carrier and shipper agree in writing to a reasonable value, above which the carrier will not be liable. 49 U.S.C. §14706(c)(1)(A). In other words, the statute requires nothing more than a valid written contract between the parties establishing a reasonable value for the purpose of limiting the liability of the carrier. Id. Although it is true that this Court and other courts have expounded at length on the various requirements imposed upon a carrier who drafts the contract seeking to limit its own liability, those requirements were intended to protect shippers from carriers who would take advantage of their own superior knowledge and leverage when dealing with unwary shippers.

This Court does not deem it proper or necessary to protect shippers from themselves. We arrive at this conclusion upon an examination of the case law from federal courts across the country spanning more than a century. We note that every

case, except one, cited by Siren in support of its position involved a *carrier* who prepared the bill of lading and presented it to the shipper. Adams Express Co. v. Croninger, 226 U.S. 491 (1913); Asset Mgt. & Control, Inc. v. ABF Freight System, Inc., 18 F.Supp 2d 187 (N.D.N.Y. 1998); Bio-Lab, Inc. v. Pony Express Courier Corp., 911 F.2d 1580 (11th Cir. 1990)[4]; Carmana Designs Ltd. v. North American Van Lines, Inc., 943 F.2d 316 (3rd Cir. 1991); Hughes v. United Van Lines, Inc., 829 F.2d 1407 (7th Cir. 1987); Jackson v. Brookledge, Inc., 991 F.Supp. 640 (E.D. Ky. 1997); New York, N.H. & Hartford Railroad Co. v. Nothnagle, 346 U.S. 128 (1953); Robinson v. Ralph G. Smith, Inc., 735 F.2d 186 (6th Cir. 1984); Rohner Gehrig Co., Inc. v. Tri-State Motor Transit, 950 F.2d 1079 (5th Cir. 1992); Tempel Steel Corp. v. Landstar Inway, Inc., 211 F.3d 1029 (7th Cir. 2000); Toledo Ticket Co. v. Roadway

---

[4]Siren strongly urges this Court to affirm the district court because Estes failed to meet the requirements set forth in Bio-Lab, Inc. v. Pony Express Courier Corp., 911 F.2d 1580 (11th Cir. 1990). In Bio-Lab, this Court required a carrier (who drafted a bill of lading and was thereby seeking to limit its liability) to meet the following four requirements before it could effectively limit its liability: "(1) maintain a tariff within the prescribed guidelines of the Interstate Commerce Commission; (2) obtain the shippers agreement as to his choice of liability; (3) give the shipper a reasonable opportunity to choose between two or more levels of liability; and (4) issue a receipt or bill of lading prior to moving the shipment." Id. at 1582. Bio-Lab is distinguishable from this case for several reasons, most importantly because the *shipper* drafted the bill of lading.

Additionally, and by way of dicta, it seems clear to this panel that certain acts of Congress render the first requirement of Bio-Lab a legal impossibility. The Trucking Industry Regulatory Reform Act of 1994 eliminated the requirement that non-household goods carriers file a tariff with the ICC. See Public Law 103-311, Title II, § 201, 108 Stat. 1683 (1994). And the ICC Termination Act of 1995 eliminated the ICC itself. See Public Law 104-88, Title I, § 103, December 29, 1995, 109 Stat. 907, effective January 1, 1996. In light of these changes in the law, the entire holding of Bio-Lab may need reconsideration, but that is not necessary to resolve this case. It is sufficient that we distinguish this case from Bio-Lab.

Express, Inc., 133 F.3d 439 (6th Cir. 1998).

The one case cited by Siren wherein the *shipper* drafted the bill of lading is Nieman Marcus Group, Inc., v. Quast Transfer, Inc., 1999 WL 436589 (N.D. Ill. 1999).  In that case, the court determined that the carrier's liability was properly limited.  Furthermore, the Nieman Marcus court expressly stated that the shipper's drafting of the bill of lading was important to the decision.  Nieman Marcus, 1999 WL 436589 *4 (it is "especially true [that the parties agreed to the limitation of liability] when the shipper itself prepared the bill of lading. . . .").

This Court has found other cases wherein the shipper drafted the bill of lading. See e.g. Mech. Tech. Inc., v. Ryder Truck Lines, Inc., 776 F.2d 1085 (2nd Cir. 1985); Hughes Aircraft Co. v. N. Am. Van Lines Inc., 970 F.2d 609 (9th Cir. 1992); Am. Cyanamid Co. v. New Penn Motor Express, Inc., 979 F.2d 310 (3rd Cir. 1992).  In each of these cases the courts limited the carrier's liability, in part because the shipper drafted the bill of lading.  Mech. Tech. Inc., 776 F.2d at 1087 ("Having had the opportunity on its own form to secure greater protection, [the shipper] 'cannot complain about the consequences of leaving the applicable spaces blank. . . .'" quoting W.C. Smith, Inc. v. Yellow Freight Sys., Inc., 596 F.Supp 515, 517 (E.D. Pa. 1983)); Hughes Aircraft, 970 F.2d at 612 ("Here, Hughes had such reasonable notice and an opportunity to make a deliberate, thoughtful choice in selecting North American's

8

liability limit because it drafted the contract and directly negotiated its terms. The party responsible for drafting the contract is ordinarily charged with knowledge of its terms and meaning."); Am. Cyanamid, 979 F.2d at 314 ("The released value was specified on [the shipper's] own form of bill of lading and, in these circumstances, it seems fair to hold it to the terms it established.").

Dealing with an ever-so-slightly different issue, this Court previously expressed a reluctance to protect a shipper from itself when it drafted a bill of lading. See Swift Textiles, Inc., v. Watkins Motor Lines, Inc., 799 F.2d 697 (11th Cir. 1986). In Swift, this Court enforced a two year statute of limitations contained within the carrier's tariff, irrespective of the fact that the shipper had no actual knowledge of the limiting provision in the tariff. Id. We explained,

> that the courts should be "reluctant to give effect to limiting clauses with which 'a carrier could shield itself from liability through manipulation of fine print clauses contained in standardized contract forms.' Calmaquip Engineering West Hemisphere Corporation v. West Coast Carriers Ltd., 650 F.2d 633, 639-40 (5th Cir. Unit B 1981) citing Encyclopaedia Britannica, supra at 14." But here we do not have a devious carrier hoping to slip a quick one over on an unsuspecting

> shipper. Rather it is the shipper's own agent who prepared the short form bill of lading on its own preprinted standardized contract form. If the shipper's agent thereby incorporated an industry-wide, indisputably legal, and federally sanctioned statute of limitations, the shipper cannot now be heard to complain about it.

Id. at 703.

We find that a similar policy is appropriate in this case, where the shipper drafted the bill of lading and incorporated industry-specific terminology which (according to the trial transcripts) undisputably includes a limitation of liability. Siren argues (and for the purposes of this case we will assume it to be true) that it did not have actual knowledge of the liability-limiting attribute incorporated within the term "Class 85". Such an argument merely transforms the issue before this Court into one involving a unilateral mistake in contract. In which case, the contract is not subject to reformation without Estes' consent. See Hughes v. United Van Lines, Inc., 829 F.2d at 1418-1419 ("once the shipper was aware that the document signed was a contract for transporting his goods, absent fraud or bad faith, the shipper cannot reform the bill of lading without the consent of the carrier on the grounds that they were unilaterally mistaken about the terms of the contract.").

Near the end of the nineteenth century, in a decision pre-dating the Carmack

Amendment, the Supreme Court explained the common law principles requiring the Court to uphold a limitation of liability clause found in a bill of lading drafted by a carrier. Hart v. Penn. R. Co., 112 U.S. 331 (1884). The Hart case involved a situation wherein the shipper signed a bill of lading drafted by the carrier, and the bill of lading specifically limited the carrier's liability in exchange for a reduced rate. Upon a loss of the goods, the shipper sought to recover the full value of the goods. Among other things, the Court determined that "[t]he presumption is conclusive that if the liability had been assumed on a valuation as great as that now alleged, a higher rate of freight would have been charged. The rate of freight is indissolubly bound up with the valuation." Id. at 337.

In 1913, and in light of the Carmack Amendment to the Interstate Commerce Act, the Supreme Court reaffirmed the common law rule that "a carrier may, by a fair, open, just, and reasonable agreement, limit the amount recoverable by a shipper in case of loss or damage to an agreed value, made for the purpose of obtaining the lower of two or more rates of charges proportioned to the amount of the risk." Adams Express Co. v. E. H. Croninger, 226 U.S. 491, 509-510 (1913). And although the Adams Court dealt with a contract drafted by a carrier in the early part of the twentieth century, the following language is certainly applicable to the case presently before us:

"It is just and reasonable that such a contract, fairly entered into, and where there is no deceit practised on the shipper, should be upheld. There is no violation of public policy. On the contrary, it would be unjust and unreasonable, and would be repugnant to the soundest principles of fair dealing and of the freedom of contracting, and thus in conflict with public policy, if a shipper should be allowed to reap the benefit of the contract if there is no loss, and to repudiate it in case of loss."

Id. at 511 (quoting Hart, 112 U.S. at 341).

This is even more true when the party seeking to avoid the terms of the contract is the party who drafted the contract. See e.g. Mech. Tech. Inc., v. Ryder Truck Lines, Inc., 776 F.2d 1085 (2nd Cir. 1985); Hughes Aircraft Co. v. N. Am. Van Lines Inc., 970 F.2d 609 (9th Cir. 1992); Am. Cyanamid Co. v. New Penn Motor Express, Inc., 979 F.2d 310 (3rd Cir. 1992). In this case, Siren drafted the bill of lading, Siren chose to use the term "Class 85", Siren did not rebut Estes' assertion at trial that "Class 85" included a limiting aspect, Siren knew "Class 85" determined the freight rate charged, and Siren knew that it received a 62% discount from Estes' full freight rate. We agree that the "rate of freight is indissolubly bound up with the valuation" placed on the

goods by the shipper. <u>Hart</u>, 112 U.S. at 337. Thus, assuming Siren did not *actually* know that it was limiting Estes' liability, Siren certainly *should* have known.

In <u>Mechanical Technologies Inc., v. Ryder Truck Lines, Inc.</u>, the Second Circuit Court of Appeals held that a carrier's tariff was incorporated by reference along with its limitation of liability clause even though the shipper did not have actual notice of the limiting aspect of the tariff. 776 F.2d 1085 (2nd Cir. 1985). That court concluded that the shipper, who drafted the contract incorporating the tariff, should have known what terms were included within the tariff. Despite the shipper's lack of actual knowledge, the court "[did] not hesitate to reach this conclusion" because the plaintiff, "an experienced shipper [who] was not forced to employ [the carrier]", used its own form contract.[5] <u>Id.</u> at 1088.

In <u>American Cyanamid Co. v. New Penn Motor Express, Inc.</u>, the Third Circuit Court of Appeals enforced a limitation of liability provision found within a bill of lading drafted by the shipper. 979 F.2d 310 (3rd Cir. 1992). Whether or not the shipper incorporated the carrier's tariff by reference was not dispositive to the <u>American Cyanamid</u> case, because the bill of lading itself contained the limiting language. <u>See</u>

---

[5] It is important to note that we are not suggesting the Estes tariff was incorporated by reference into the bill of lading in this case. However, it is instrumental to look at cases like <u>Mechanical Technologies Inc.</u>, because they illustrate the point that the courts are more willing to limit a carrier's liability when the shipper drafts the bill of lading.

Id. at 312 n.1.[6]

After consideration of the above cited authorities and the facts of this case, we hold that when a shipper drafts a bill of lading, incorporating language which is universally understood throughout the motor carrier industry to limit the liability of the carrier, said shipper will be bound by the terms of the contract, irrespective of whether the shipper had actual knowledge of the limiting aspect of those terms. Furthermore, the fact that the carrier's tariff was not incorporated by reference in the

---

[6]Although we cite American Cyanamid Co. v. New Penn Motor Express, Inc., approvingly, we must point out that we ultimately reach a different conclusion than the American Cyanamid court. 979 F.2d 310 (3rd Cir. 1992). There the Third Circuit Court of Appeals affirmed the district court's decision to dismiss the case for lack of jurisdiction. The district court in American Cyanamid properly held that the limitation of liability clause in the bill of lading was enforceable, and therefore limited the shipper's damages to $2,084.00. Based on that limitation the district court "dismissed the case, as the $10,000 jurisdictional threshold in 18 U.S.C. §1337(a) had not been met." Id. at 312. After a full and proper review of the limitation of liability issue, the Circuit Court affirmed the district court without discussing the jurisdictional issue. This was probably because the facts of American Cyanamid were such that it was clear that the plaintiff had not pled the jurisdictional amount in good faith.

The case before us is not one that ought to be dismissed for lack of jurisdiction. "The rule governing dismissal for want of jurisdiction in cases brought in the federal court is that, unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal. The inability of plaintiff to recover an amount adequate to give the court jurisdiction does not show his bad faith or oust the jurisdiction. Nor does the fact that the complaint discloses the existence of a valid defense to the claim. But if, from the face of the pleadings, it is apparent, to a legal certainty, that the plaintiff cannot recover the amount claimed or if, from the proofs, the court is satisfied to a like certainty that the plaintiff never was entitled to recover that amount, and that his claim was therefore colorable for the purpose of conferring jurisdiction, the suit will be dismissed." St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, 288 (1938). Although the Supreme Court was referring to the jurisdictional limit required for diversity jurisdiction, we see no reason to apply a different rationale to the $10,000.00 jurisdictional limit set forth in 18 U.S.C. §1337(a). Siren's claim was brought in good faith, and the federal courts have jurisdiction to resolve this dispute.

14

contract is not dispositive of the limitation of liability issue.

## CONCLUSION

For the reasons set forth above, the district court's order granting Siren's motion for a directed verdict is VACATED and this matter is REMANDED with instructions to modify the final judgement in favor of Siren to reflect a recovery in the amount of $8,309.00.