[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 07-15488
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JAN 12, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 06-61470-CV-PAS

WERNER ENTERPRISES, INC.,

Plaintiff
Counter Defendant,
Third Party Plaintiff,
Appellee,

ACE SEGUROS SA,

Consol. Plaintiff
Appellant,

versus

WESTWIND MARITIME INTERNATIONAL, INC.,
WESTWIND INTERNATIONAL, INC.,

Defendants
Counter Defendants
Third Party Defendants
Appellees,

TRANSPRO LOGISTICS, INC.,

Defendant
Counter Claimant
Third Party Defendant
Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

**(January 12, 2009)**

Before EDMONDSON, Chief Judge, and ANDERSON, Circuit Judge, and
COHILL,* District Judge.

ANDERSON, Circuit Judge:

In this case, Ace Seguros, S.A. ("Ace") sued Werner Enterprises, Inc.

("Werner") to recover the full value of a shipment of lost cell phones under the

Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 14706

("Carmack Amendment").  The district court, in a summary judgment ruling in

favor of Werner, sustained Werner's limitation of its liability.  Ace appeals.

Communicaciones Nextel de Mexico, S.A. de C.V. ("Nextel") had the cell

phones manufactured, and arranged through intermediaries to have Werner, a

common carrier, transport them.  Nextel insured the full value of its shipments

through Ace, its insurance company.  The cell phones were stolen during transit.

Ace paid Nextel's claim for the loss, and was subrogated to the interests of Nextel.

The primary issue in this case involves the validity of Werner's limitation of

_____

* Honorable Maurice B. Cohill, Jr., United States District Judge for the Western District of Pennsylvania, sitting by designation.

its liability (to $200,000). That issue in turn depends on whether this case is distinguishable from the Supreme Court's decision in Norfolk Southern Railway Co. v. Kirby, 543 U.S. 14, 125 S. Ct. 385, 160 L.Ed.2d 283 (2004). We determine that Kirby is not distinguishable. Ace also argues that Werner did not take the steps necessary under the Carmack Amendment to limit its liability. We conclude that the contractual limitation of liability here complied with the applicable statutory requirements. Finally, Ace argues that the district court applied an incorrect rate of prejudgment interest. We find no error. Accordingly, for the reasons set forth in greater detail below, we affirm.

## I.  BACKGROUND

In 1999 or 2000, Nextel began using Westwind Maritime International, Inc. and Westwind International, Inc. (collectively "Westwind") to arrange for the transportation of cell phones from a Motorola plant in Plantation, Florida to a customs broker in Texas. Westwind brokered approximately one shipment a week of Motorola cell phones for Nextel from Florida to Texas.

The invoice for Westwind's services ("Invoice"), the only contract between Nextel and Westwind, notified Nextel that third party carriers might limit their liability for loss. Paragraph 7 of the Invoice stated:

> **Declaring Higher Value to Third Parties**.  Third parties to

whom the goods are entrusted may limit liability for loss or damage; the Company will request excess valuation coverage only upon specific written instructions from the Customer, which must agree to pay any charges therefore; in the absence of written instructions or the refusal of the third party to agree to a higher declared value, at Company's discretion, the goods may be tendered to the third party, subject to the terms of the third party's limitations of liability and/or terms and conditions of service.

Nextel received this standard shipping invoice approximately 250 times prior to the loss at issue.

Beginning around 2000, Westwind periodically arranged for carriage of the Motorola cell phones through Transpro Logistics ("Transpro"). In November of 2000, Transpro entered into a Broker Transportation Agreement ("BTA") with Werner. The BTA governed the general business relationship between the parties. Paragraph 6 contained the following limitation of liability clause:

Carrier's liability for loss, damage or injury to cargo occurring while in the possession or under the control of Carrier hereunder, and resulting from Carrier's performance of the services provided for in this Agreement, shall be the same standard of liability imposed by 49 U.S.C. Section 14706 and applicable common law. Provided, that the Carrier's maximum liability for loss or damage to cargo shall not in any event exceed Two Hundred Thousand Dollars ($200,000) per truckload shipment unless a higher degree of liability is specifically assumed in writing by an authorized representative of Carrier.

Paragraph 3 of the BTA also incorporated Werner's tariff, and item 380 of the tariff includes the following provision:

4

On domestic shipments within the United States of America and Canada, shippers may, at their option, select liability coverage for loss or damage to cargo as set forth in 49 U.S.C. § 14706 ("Carmack Liability") as provided in item 385. If Carmack Liability is not selected, Carrier's liability for loss or damages to shipments within the United States and Canada is limited to the lesser of (1) the actual value of the cargo so lost or damaged, or (2) a maximum of Two Hundred Thousand Dollars ($200,000) per truckload shipment.

Item 385 of the tariff states:

Title 49 U.S.C. § 14706 provides for full value liability and other liability terms for the carrier and shipper regarding loss and damage to cargo. In order for the full liability terms of the provision to apply to any shipment transported by Carrier the shipper must comply with **all** of the following requirements:

1. The shipper must notify Carrier no less than seventy-two (72) hours prior to pickup of the shipment for transportation that the shipper chooses Carmack Liability protection.
2. The shipper must have prepaid the Carmack Liability rate which is computed as (a) the rate quoted to shipper in writing, or in the absence of a specific written quotation, the rate contained in Carrier's standard rate matrix, **plus** (b) two hundred fifty percent (250%) of said rate.
3. The shipping instructions on the bill of lading or shipping document must specifically note: (a) that the shipment is moving under 49 U.S.C. § 14706 full liability terms, and (b) that the shipment is subject to Carmack Liability rates.

(emphasis in original). Nextel never requested full liability coverage from Westwind for any shipment. Thus, Westwind never requested full liability coverage from Transpro, which never invoked the provisions of item 385 in Werner's tariff. Nextel insured the full value of all its shipments through Ace.

5

On October 8, 2004, a shipment of 7,958 cell phones valued at approximately $1,251,673.30 was stolen from one of Werner's trucks. At Nextel's request, the lost shipment was carried under a Motorola manifest signed by the Werner driver. The district court granted summary judgment in favor of Ace as to liability for the lost shipment. However, the district court also granted Werner's motion for summary judgment as to limitation of liability and entered a judgment in the amount of $200,000.[1] Ace appeals the latter ruling.

## II. DISCUSSION

Two Supreme Court precedents go a long way toward resolving this dispute. First, we will discuss these decisions and the manner in which they foreclose many of Ace's arguments. We then turn to the requirements under the Carmack Amendment to limit liability. Finally, we discuss the appropriate rate of prejudgment interest.[2]

A. <u>Cargo Owners (i.e. Shippers) are Bound by Liability Limitations Negotiated Between an Intermediary and a Carrier</u>

In <u>Norfolk Southern Railway Co. v. Kirby</u>, the Supreme Court set an efficient

---

[1] We review the entry of summary judgment <u>de novo</u>. <u>See</u> <u>Whately v. CNA Ins. Co.</u>, 189 F.3d 1310, 1313 (11th Cir. 1999). Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of fact and compels judgment as a matter of law. <u>Id.</u>; Fed. R. Civ. P. 56(c).

[2] Ace's remaining arguments are dismissed without need for further discussion.

default rule for liability limitations in carriage contracts: "When an intermediary contracts with a carrier to transport goods, the cargo owner's recovery against the carrier is limited by the liability limitation to which the intermediary and carrier agreed." 543 U.S. 14, 33, 125 S. Ct. 385, 398, 160 L.Ed.2d 283 (2004). Kirby hired International Cargo Control ("ICC") to arrange for the shipment of machinery from Australia to Huntsville, Alabama. Kirby accepted a contractual liability limitation in ICC's bill of lading. Id. at 19, 125 S. Ct. at 390. Then, ICC hired Hamburg Sud to transport the cargo from Australia to Savannah and on to Huntsville, and accepted an even greater limitation of liability in Hamburg Sud's bill of lading. Next, Hamburg Sud hired Norfolk Railway to transport the machinery from Savannah to Huntsville. A "Himalaya Clause" extended the limited liability in Hamburg Sud's bill of lading to Norfolk.[3] Maritime law governed all the contracts. The Norfolk train derailed causing extensive damage to the cargo. Kirby sued Norfolk for the full value of its loss. Norfolk invoked the limitation of liability in Hamburg Sud's bill of lading. Id. at 21, 125 S. Ct. at 391-92. Applying its default rule, the Court held that the limitation of liability in Hamburg Sud's bill of lading bound Kirby. Id. at 34-36, 125 S. Ct. at 399-400. In

---

[3] Himalaya Clauses extend liability limitations to downstream parties, in this case to "all agents . . . (including inland) carriers . . . and all independent contractors whatsoever." Kirby, 543 U.S. at 20-21, 125 S. Ct. at 391.

doing so, the Court sought to eliminate the need for carriers to commit time and effort investigating long chains of parties and agreements, thereby potentially causing higher shipping rates. Id. at 34-35, 125 S. Ct. at 399. Furthermore, the Court found the rule equitable. Id. at 35, 125 S. Ct. at 399. Kirby retained the option to sue ICC under the terms it negotiated in ICC's bill of lading. Id.

The Supreme Court expressly derived its holding from Great Northern Railway Co. v. O'Connor, 232 U.S. 508, 34 S. Ct. 380, 58 L.Ed. 703 (1914). See Kirby, 543 U.S. at 33, 125 S. Ct. at 398. O'Connor employed the Boyd Transfer Company to arrange for the shipment of some of her personal effects from Minnesota to Oregon. The Boyd Company used Great Northern to transport the cargo. Great Northern's tariff stated that household goods with a value not to exceed $10 per hundredweight were shipped at a rate of $1 per hundredweight. The railroad's bill of lading, signed by the Boyd Company, indicated that O'Connor's cargo was shipped on the $1 rate and released at a value of $10 per hundredweight. The goods were lost en route and O'Connor sued Great Northern to recover their full value. Great Northern invoked the limitation of liability in its tariff and bill of lading. Great Northern, 232 U.S. at 509-510, 34 S. Ct. at 381. The Court held that "the carrier had the right to assume that the transfer company could agree upon the terms of the shipment." Id. at 514, 34 S. Ct. at 383. The plaintiff's

8

remedy for loss beyond the amount of the limitation was against the Boyd Company. Id.

These cases guide us to dispose of and foreclose several of Ace's arguments, as follows. First, Kirby's teaching is not limited to maritime law. Kirby expressly derived its holding from Great Northern, a non-maritime case.[4] Furthermore, the principles of fairness and efficiency animating the Kirby rule are not unique to the maritime context. As evidenced by the circumstances of this case, contracts for carriage on land as well as sea may involve extended chains of parties and agreements. Thus, the benefits of allowing carriers to rely on limitations of liability negotiated by intermediaries are equally as great here as under maritime law.

---

[4] Ace's attempt to distinguish Great Northern fails. When the Supreme Court decided Great Northern, the law required carriers to file tariffs for household goods with the Interstate Commerce Commission. Interstate Commerce Act, ch. 104 § 6, 24 Stat. 379, 381 (1887); see also Great Northern, 232 U.S. at 511, 34 S. Ct. at 382. Ace contends that the act of filing the tariff gave cargo owners notice of its liability limitations. However, the ICC Termination Act of 1995 eliminated the tariff filing requirement for household good carriers. See Pub. L. No. 104-88, 109 Stat. 803, 868-69 (codified at 49 U.S.C. § 13702). As a result, Ace argues that the Supreme Court's reliance on Great Northern no longer justifies the expansion of Kirby into non-maritime law because cargo owners no longer have notice of liability limitations in carriers' tariffs. This argument cannot succeed. Merely filing a tariff does not give a cargo owner notice of liability limitations because the cargo owner remains unaware if its intermediary actually selects the limited liability rate. In fact, this was the exact factual circumstance in Great Northern. 232 U.S. at 510, 34 S. Ct. at 381. Furthermore, Kirby was decided in 2004, long after the tariff filing requirements were altered in 1995. In relying on Great Northern, the Supreme Court gave no indication that its holding was affected by the change in tariff filing requirements. Thus, Ace asserted no persuasive reason to decline to extend Kirby beyond maritime cases.

Second, Westwind's failure to negotiate a liability limitation with Transpro does not affect the application of the Kirby rule. In Kirby, each intermediary negotiated a limitation of liability with the party immediately downstream. See Kirby, 543 U.S. at 18-21, 125 S. Ct. at 390-91. Here, Transpro and Westwind did not negotiate a limitation of liability. As a consequence, Ace argues that contracts downstream from this "gap" cannot be imputed back to Nextel. However, the holding in Kirby did not depend on each party's negotiation of a liability limitation. In fact, the rule expressly made such interactions irrelevant. Carriers do not need to investigate upstream contracts. They are entitled to assume that the party entrusted with goods may negotiate a limitation of liability. To hold otherwise would defeat the principle of efficiency that motivated the Kirby holding. Moreover, this again produces an equitable result. The cargo owner retains the option to sue the intermediary who failed to protect itself by negotiating a liability limitation.

Ace relies heavily on Atkins Machinery v. CH Powell Co., Inc., 455 F. Supp. 2d 461 (D.S.C. 2006), to bolster its argument. However, Atkins provides no support for Ace's position.[5] In Atkins, the plaintiff contracted with a freight

---

[5] Moreover, Atkins is a federal district court decision from another Circuit, and would not be binding in any event.

forwarder to make arrangements for the transportation of some of its machinery. The freight forwarder contracted with D.M. Consol Line ("DML") to charter space on an American President Lines ("APL") vessel. APL hired Cooper, L.L.C. ("Cooper") to perform stevedore services. Cooper negligently damaged the machinery. The plaintiff sued Cooper to recover damages. Cooper sought to limit its liability under the terms of APL's standard bill of lading. Id. at 463. The district court rejected this argument because Cooper failed to show that DML and APL intended APL's standard bill of lading to apply to the handling of the particular machinery that was damaged. Id. at 469-70. In fact, the district court found that there was no evidence DML and APL negotiated any limitation of liability with respect to this particular machinery. Thus, Atkins stands for the unremarkable proposition that Cooper could not limit its liability under a contract none of the parties ever agreed would govern the handling of the cargo at issue. In other words, Cooper was entitled to no limitation of liability where Cooper had no contract (nor was a beneficiary of any contract) entitling it to do so.

Ace makes a strained attempt to argue that this opinion, decided after Kirby, supports the assertion that each intermediary must negotiate a limitation of liability. Just as DML and APL failed to negotiate a limitation of liability, Ace argues that Westwind and Transpro also failed to negotiate for a limitation. According to Ace,

11

because Transpro failed to negotiate a limitation of liability with Westwind, Transpro was no longer "empowered" under traditional agency principles to negotiate a limitation of liability with Werner. Atkins does not stand for such a sweeping proposition, which, as discussed above, would be squarely inconsistent with the holding and rationale of Kirby. Atkins merely states the common sense rule that in order to limit a cargo owner's recovery the intermediary and the carrier must agree to some limitation of liability.

### B. A Carrier Must Give a Cargo Owner or Its Intermediary a Reasonable Opportunity to Choose Between Two or More Levels of Liability

Under the Carmack Amendment, a carrier of property in interstate commerce is liable for "the actual loss or injury to the property caused by" the carrier. 49 U.S.C. § 14706(a)(1). However, a carrier may limit its liability "to a value established by written or electronic declaration of the shipper or by written agreement between the carrier and shipper if that value would be reasonable under the circumstances surrounding the transportation." Id. § 14706(c)(1)(A). The Eleventh Circuit uses a four-step inquiry to determine whether a carrier has effectively limited its liability under the Carmack Amendment. A carrier must: (1) maintain a tariff within the prescribed guidelines of the Interstate Commerce Commission, (2) give the shipper a reasonable opportunity to choose between two

12

or more levels of liability, (3) obtain the shipper's agreement as to the choice of liability, and (4) issue a receipt or bill of lading prior to moving the shipment. Sassy Doll Creations, Inc. v. Watkins Motor Lines, 331 F.3d 834, 838-39, 841 (11th Cir. 2003).[6] Ace claims that Werner did not meet the second element of this test. We disagree.

In Sassy Doll, the reasonable opportunity to choose was also in dispute.[7] There, the shipper brought an action against the carrier to recover damages for the full value of a lost shipment of perfume. Id. at 836. The carrier's tariff required

---

[6] The Trucking Industry Regulatory Reform Act of 1994, Pub. L. No. 103-311, 108 Stat. 1673, and the ICC Termination Act of 1995 ("ICCTA"), Pub. L. No. 104-88, 109 Stat. 803, made several statutory changes that alter the first prong of this test. First, ICCTA abolished the Interstate Commerce Commission and replaced it with the Surface Transporation Board. Second, these Acts eliminated the requirement that certain carriers file tariffs with the Interstate Commerce Commission, and substituted the requirement that a carrier provide a shipper, on request, with "a written or electronic copy of the rate, classification, rules, and practices, upon which any rate applicable to its shipment or agreed to between the shipper and carrier is based." 49 U.S.C. § 13710(a); see Sassy Doll, 331 F.3d at 841. In other circumstances carriers are now required to file tariffs with the Surface Transportation Board. See 49 U.S.C. § 13702.

[7] Sassy Doll, decided in 2003, resolved a direct dispute between a carrier and a cargo owner. By virtue of Kirby, decided in 2004, the second element is now satisfied if the carrier gives the cargo owner or its intermediary notice and a reasonable opportunity to choose between two or more levels of liability. Ace's insistence that the second element of Sassy Doll requires that the carrier not only give such notice of liability limitations to the intermediary with whom the carrier deals, but also requires the carrier to give such notice to each intervening intermediary (and ultimately to the owner or shipper) is inconsistent with the Supreme Court's ruling in Kirby. "[W]hen it comes to liability limitations for negligence resulting in damage, an intermediary can negotiate reliable and enforceable agreements with the carriers it engages." Kirby, 543 U.S. at 33, 125 S. Ct. at 398. Contrary to Ace's argument, Kirby eliminated the need for carriers to investigate the long chain of intermediaries. Id. at 34-35, 125 S. Ct. at 399. Moreover, although not necessary under Kirby, Nextel did have notice of the liability limitation. Paragraph 7 of Westwind's Invoice expressly stated that downstream intermediaries might limit liability.

13

the shipper to indicate in writing on the bill of lading the total dollar amount of excess liability coverage requested.  The bill of lading contained a declared value box, where the shipper filled in the actual value of the perfume.[8]  However, the bill of lading did not contain a section for the shipper to insert a request for additional coverage.  Id. at 837-38.  Accordingly, this Court found: "Forcing the shipper to express a choice where there is no proper place to do so is not providing the shipper with a reasonable opportunity to choose."  Id. at 843.

Relying on this authority, Ace argues that – contrary to the requirement of Sassy Doll that the shipper must have an opportunity to choose a higher level of liability – the BTA gave the carrier, rather than the shipper, the power to assume a higher amount of coverage.  According to Ace, this is the same type of illusory choice seen in Sassy Doll.  Ace relies on Paragraph 6 of the BTA, which states: "Carrier's maximum liability for loss or damage to cargo shall not in any event exceed Two Hundred Thousand Dollars ($200,000) per truckload shipment unless a higher degree of liability is specifically assumed in writing by an authorized

---

[8] As noted in the text, in Sassy Doll, the shipper indicated on the bill of lading the full value of the shipped goods, thus fulfilling a major portion of the process to select full liability coverage under the carrier's tariff.  Unlike Sassy Doll, in the instant case no one on behalf of Nextel ever indicated to Werner what the full value of the goods was or that full liability coverage was sought.  Transpro did not do so in its written agreement with Werner.  Neither Nextel nor its manufacturer, Motorola, so indicated.  The manifest under which the goods were carried was silent in this regard.

representative of Carrier." However, we do not read the BTA as Ace urges.

Paragraph 6 must be read in conjunction with Paragraph 3, which incorporates the

terms of Werner's tariff. The tariff states that "shippers may, at their option, select

liability coverage for loss or damage to cargo as set forth in 49 U.S.C. § 14706

("Carmack Liability") as provided in item 385." These terms can be readily

reconciled. Thus, under the BTA, the shipper is given the opportunity to elect full

liability coverage by completing the steps listed in item 385 of the tariff, paying the

increased freight rate and obtaining the carrier's authorization in writing. Contrary

to Ace's argument, in this case it is the shipper (or Transpro, the shipper's agent to

select limited liability pursuant to <u>Kirby</u>) who ultimately has the power to elect

higher coverage.[9] The carrier simply has the right to approve the request and

charge a correspondingly higher rate.

We also disagree with Ace's assertion that the shipping document itself must

include the choice of rates in order for the shipper to have a reasonable opportunity

to choose between them. Our decision in <u>Siren, Inc. v. Estes Express Lines</u>, 249

F.3d 1268 (11th Cir. 2001), forecloses this argument. In <u>Siren</u>, the shipper sued the

carrier for the full value of a lost shipment of razor blades. The shipper prepared

---

[9] Transpro of course was party to the BTA and also possessed a copy of Werner's tariff, which was incorporated.

the bill of lading. It indicated that the shipment would travel under "Class 85," a designation commonly understood throughout the trucking industry to limit a carrier's liability to $11.87 per pound. Furthermore, the carrier's tariff stated that Class 85 shipments included a liability limitation of $11.87 per pound. Id. at 1269. The question before this Court was whether the bill of lading could limit the carrier's liability if it did not incorporate by reference the carrier's tariff and choice of liability limitations. Id. at 1270. We referred to the statute itself that allowed a carrier to limit its liability, by "written agreement between the carrier and the shipper." Id. at 1270 (quoting 49 U.S.C. § 14706 (c)(1)(A)). We held:

> The statute merely requires that the carrier and shipper agree in writing to a reasonable value, above which the carrier will not be liable. In other words, the statute requires nothing more than a valid written contract between the parties establishing a reasonable value for the purpose of limiting the liability of the carrier.

Id. at 1271 (citation omitted).

We were particularly persuaded by the fact that the shipper drafted the bill of lading. Id. In fact, we have consistently been reluctant to protect a sophisticated shipper from itself when it drafts a shipping document. See Sassy Doll, 331 F.3d at 843 ("Our sympathy does not go out to the drafter of a bill of lading who blames another party for the results that flow from defects in that document"); Swift Textiles, Inc., v. Watkins Motor Lines, Inc., 799 F.2d 697, 704 (11th Cir. 1986)

16

(holding that the shipper could not complain that it did not have actual notice of a tariff provision incorporated by reference in a shipping document prepared by the shipper's own agent).

The facts of this case are analogous. Nextel requested the use of the Motorola manifest rather than a bill of lading as the shipping document. We are not persuaded by the allegations of defect in that document. Werner and Transpro entered into the BTA, a valid written contract, which incorporated Werner's tariff and provided that each shipment was "deemed to move on a uniform straight bill of lading" as contained in Werner's tariff. The tariff limited Werner's liability to $200,000 per truckload unless Transpro selected higher liability. Moreover, the tariff, in item 385, gave precise instructions to the shipper (or in this case to Transpro, the shipper's agent to select limited liability pursuant to Kirby) as to how to select a higher level of liability coverage. Therefore, we conclude that Werner and Transpro entered into a written contract providing the shipper with a reasonable opportunity to choose between two or more levels of liability. As we held in Siren, this is all that is required under the Carmack Amendment. The manifest itself did not need to include the choice of levels of liability and rates; that choice was provided in a separate written contract, and Transpro chose not to increase the liability for this shipment or any of its shipments on behalf of Nextel.

17

Thus, the requirements of the Carmack Amendment, as laid out in <u>Sassy Doll</u>, are satisfied.

### C. The Rate of Prejudgment Interest

The district court's decision to award prejudgment interest is reviewed for abuse of discretion. <u>In Re Int'l Admin. Serv., Inc. v. Northern</u>, 408 F.3d 689, 709 (11th Cir. 2005). "In the absence of a controlling statute, the choice of a rate at which to set the amount of prejudgment interest is also within the discretion of a federal court." <u>Id.</u> at 710; <u>see also</u> <u>Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH</u>, 141 F.3d 1434, 1447 (11th Cir. 1998). "That decision is 'guided by principles of reasonableness and fairness, by relevant state law, and by the relevant fifty-two week United States Treasury bond rate, which is the rate that federal courts must use in awarding post-judgment interest.'" <u>In Re Int'l Admin. Serv., Inc.</u>, 408 F.3d at 710 (quoting <u>Indus. Risk Insurers</u>, 141 F.3d at 1447 (citing 28 U.S.C. § 1961)).[10] The district court used as guidance the rate that

---

[10] In <u>Sunderland Marine Mutual Insurance Co. v. Weeks Marine Construction Co.</u>, 338 F.3d 1276, 1280 (11th Cir. 2003), we held, in that admiralty case, that the rate of prejudgment interest that should be awarded is the prime rate during the relevant period. As evidenced by the pre-<u>Sunderland</u> case cited in the text, and other binding pre-<u>Sunderland</u> cases, district courts have long had discretion in this Circuit to set the rate of prejudgment interest in both maritime and non-maritime contexts. <u>See also</u> <u>Kilpatrick Marine Piling v. Fireman's Fund Ins. Co.</u>, 795 F.2d 940, 947 (11th Cir. 1986) (holding that admiralty courts have discretion in setting the rate of prejudgment interest). Because panels prior to the decision in <u>Sunderland</u> had held that the choice of a rate for prejudgment interest is within the discretion of the district court, we need not address the binding effect of <u>Sunderland</u>, even in a maritime case. We hold only that in this non-

federal courts use in awarding post-judgment interest.  Ace presented no evidence

to show that this was unfair or an abuse of discretion.  Accordingly, we find no

error.

## III.  CONCLUSION

For the foregoing reasons, we affirm the district court's entry of summary

judgment as to limitation of liability in favor of Werner.

AFFIRMED.

---

maritime case, Sunderland is not binding, and the district court did not abuse its discretion.