AGEE, Circuit Judge,
concurring in part and dissenting in part:
I concur in the majority opinion except as to those parts of Sections III and IV that conclude that the district court improperly granted CSX’s[1] motion for partial summary judgment. In my view, both the record and circuit precedent support the grant of partial summary judgment in favor of CSX. Accordingly, I respectfully dissent as to the above-noted parts of the majority opinion.
I
As a preliminary matter, the BOL in the transaction at issue was drafted by ABB, the shipper, on its own standardized form. The BOL clearly stated,
Shipper hereby certifies that he is familiar with all the terms and conditions of the said bill of lading, including those on the back thereof, set forth in the classification or tariff which governs the transportation of this shipment, and the said terms and conditions are hereby agreed to by the shipper and accepted for himself and his assigns.
J.A. 121.
CSX’s effective rate schedule at the time of the shipment, Price List 4605, clearly stated, “Carriers’ maximum liability for lading loss or damage will not exceed $25,000 per shipment. Full liability coverage is only available by calling your sales representative for a specific quote.” J.A. 117.
Although ABB employees testified that they were not aware of Price List 4605 prior to drafting the BOL, CSX employees testified that Price List 4605 was published on the CSX company website and was available upon request from any of its sales representatives. ABB does not dispute that Price List 4605 was available on CSX’s company website. ABB merely asserts that its employees attempted to contact CSX to obtain a price quote, but had no success in receiving rate information by telephone.[2] Despite its inability to receive price information from CSX, ABB still chose to ship a $1.384 million transformer using CSX as the carrier.
II
A
The majority holds that “the parties did not reach a written agreement to limit CSX’s liability and, accordingly, the Car-mack Amendment operated to impose full liability on CSX.” Majority Op. 142.[3] On this point, we disagree. The record shows that the parties made such a written *147 agreement and that the agreement complies with the requirements of the Car-mack Amendment and limits CSX’s liability.
The Carmack Amendment allows a commercial rail carrier to limit its liability with the shipper’s written consent.
A rail carrier providing transportation or service subject to the jurisdiction of the Board under this part may establish rates for transportation of property under which—
(A) the liability of the rail carrier for such property is limited to a value established by written declaration of the shipper or by a written agreement between the shipper and the carrier; or
(B) specified amounts are deducted, pursuant to a written agreement between the shipper and the carrier, from any claim against the carrier with respect to the transportation of such property.
49 U.S.C. § 11706(c)(3).
Courts determine whether such written consent is effective under the Carmack Amendment by considering whether the carrier (1) provided a tariff to the shipper upon the shipper’s request,[4] (2) “gave the shipper a reasonable opportunity to choose between two or more levels of liability” (at least one of which was full liability coverage), (3) “obtain[ed the] shipper’s agreement as to his choice of carrier liability,” and (4) “issue[d] a bill of lading prior to moving the shipment.” See OneBeacon Ins. Co. v. Haas Indus., Inc., 634 F.3d 1092, 1099-1100 (9th Cir.2011).[5]
Two of the above requirements are easily disposed of. As to the first requirement, ABB does not dispute that CSX never, in fact, received a request for its rates or tariff from ABB. While ABB asserts that it made several telephone calls to CSX that went unreturned, ABB presented no evidence that it ever made actual contact with an authorized CSX agent to request CSX’s rate information. Nor does ABB present any evidence to rebut CSX’s testimony that its rate information was available on its website. And courts have concluded that the fourth requirement, *148 that a carrier issue a bill of lading prior to shipment, is also satisfied when the shipper prepares the bill of lading. See, e.g., Siren, Inc. v. Estes Express Lines, 249 F.3d 1268, 1273 (11th Cir.2001). Thus, at issue in this case is only whether ABB had a reasonable opportunity to choose between two or more levels of liability and whether ABB agreed in writing to limited liability on the part of CSX.
The record reflects that CSX provided ABB with a reasonable opportunity to choose between different levels of liability coverage. The facts of this case seem indistinguishable from those in Werner Enterprises v. Westwind Maritime International, Inc.[6] In Wemer, the Eleventh Circuit considered whether a shipper was given a reasonable opportunity to elect full liability coverage when the shipping document incorporated by reference the carrier’s tariff, which contained a $200,000 limitation on liability. 554 F.3d 1319, 1328 (11th Cir.2009). Notably, the tariff at issue in Wemer instructed a shipper to specifically notify the carrier when it wanted full liability coverage. Id. As in the case at bar, the shipper in Wemer never expressly requested full liability coverage from the carrier. Id. at 1323. The shipper in Wemer argued that it did not have a meaningful opportunity to request full liability coverage because the carrier’s default coverage was limited. Id. at 1327. Faced with this argument, the Eleventh Circuit held that the carrier properly limited its liability within the requirements of the Carmack Amendment because it provided the shipper with the right to request full liability coverage. Id.
ABB makes the same argument rejected by the Eleventh Circuit in Wemer — that CSX’s default policy of limited liability deprived it of a reasonable opportunity to choose full liability coverage. Yet like the carrier in Wemer, CSX merely reserved “the right to approve the request [for full liability coverage] and charge a correspondingly higher rate.” Id. CSX’s effective tariff, Price List 4605, incorporated by reference in the BOL, provided shippers with the right to elect full liability coverage.
Although ABB argues that it was not aware of Price List 4605, it is undisputed that CSX’s policy requiring its shippers to affirmatively request full liability coverage was not new to Price List 4605 and was not a change in policy from prior dealings between CSX and ABB. In fact, ABB admits that in its past dealings with CSX as well as other carriers, it always had to expressly request full liability coverage in order to receive it and that it was aware that rail carriers limited their liability to amounts as low as $25,000 prior to the shipment at issue. It is therefore easy to conclude that, as in Wemer, CSX provided ABB with a reasonable opportunity to elect full liability coverage, an opportunity ABB chose not to avail itself of for reasons known only to ABB.[7]
*149 This conclusion is further supported by the fact that ABB drafted the BOL in this case. ABB argues at length that various problems with ABB’s own BOL deprived it of a reasonable opportunity to choose full liability coverage. Among other things, ABB argues that its form bill of lading would not allow the employee filling it out to enter a value in the “declared value” box of the form. ABB’s entire line of argument, however, completely ignores the fact that ABB created the bill of lading form and tendered it as a contract to CSX. While a carrier may not require a shipper to use a form that deprives the shipper of a reasonable opportunity to request full liability coverage, any defects in a form created by a shipper are “no more than a unilateral mistake” that cannot later be used against a carrier. Sassy Doll, 331 F.3d at 842; see Werner, 554 F.3d at 1328 (stating that, while rejecting a similar claim, the court was “particularly persuaded by the fact that the shipper drafted the bill of lading.”); Norton v. Jim Phillips Horse Transp., Inc., 901 F.2d 821, 830 (10th Cir.1989) (“Carriers should not be held to a standard that would impose liability on them due to a unilateral mistake by an experienced shipper.”); Hughes v. United Van Lines, Inc., 829 F.2d 1407, 1418-19 (7th Cir.1987) (“[0]nce the shipper was aware that the document signed was a contract for transporting his goods, absent fraud or bad faith, the shipper cannot reform the bill of lading without the consent of the carrier on the grounds that they were unilaterally mistaken about the terms of the contract.”). ABB cannot rely on its own negligence in introducing its own defective document into the commercial marketplace to avoid the resulting consequences of its contractual covenants. Nothing in the Carmack Amendment requires the carrier to hold the shipper harmless for the shipper’s negligence, particularly where the carrier has every reason to take the shipper at its word.
Moreover, ABB agreed in writing to CSX’s limitation on liability. On its face, the BOL unambiguously incorporated CSX’s effective tariff, which was Price List 4605, and therefore functioned to limit CSX’s liability in accordance with the Car-mack Amendment. Specifically, ABB certified that it was “familiar with all the terms and conditions ... set forth in the classification or tariff which governs the transportation of this shipment” and that it agreed to be bound by those terms and conditions. J.A. 121. The majority opinion treats this unambiguous, binding contract language as inoperative, however, because (1) the reference to the “tariff which governs the transportation of this shipment” is generic boilerplate language and (2) the BOL does not specifically mention Price List 4605.
ABB concedes that the BOL is a valid, binding contract between the parties. The Court must therefore read that contract consistently with the applicable contract law of the state in which the contract was formed. See CTI/DC, Inc. v. Selective Ins. Co. of Am., 392 F.3d 114, 118 (4th Cir.2004). Because ABB asserts that the contract was formed in Missouri and CSX does not argue otherwise on appeal, we apply Missouri law.
Under Missouri law, the parol evidence rule bars courts from considering whether a party to a contract may have “intended anything other than what was written” in the contract document. See Celtic Corp. v. Tinnea, 254 S.W.3d 137, 143 (Mo.Ct.App.2008). One party’s unilateral mistake cannot serve as the basis of rescission under Missouri law unless the mistake related to a material fact and the other party to the contract knew or should have known of the mistake. See Kassebaum v. Kassebaum, 42 S.W.3d 685, 693 (Mo.Ct.App.2001).
*150 ABB argues that the contract language is unenforceable as written because the term “tariff’ refers only to tariffs lawfully filed with the ICC prior to deregulation, rendering that term essentially meaningless in the ensuing 20 years of the deregulation era. Yet even after deregulation, rate schedules and price lists, such as Price List 4605, are still commonly, if not uniformly, referred to as tariffs. See, e.g., Werner, 554 F.3d at 1328 (referring to the carrier’s post-deregulation shipping document as a “tariff’); Sassy Doll, 331 F.3d at 841 (holding that, in the deregulation era, “a carrier is now required to provide a shipper with the carrier’s tariff if the shipper requests it, instead of the shipper filing its tariff with the now-defunct ICC”). Moreover, Price List 4605 clearly falls within the plain meaning of the term “tariff,” which is defined as “a listing or scale of rates or charges for a business or a public utility.”[8] Webster’s Third New International Dictionary 2341 (2002). Thus, the BOL plainly and unambiguously stated on its face that ABB was familiar with the terms and conditions of CSX’s effective tariff, which was Price List 4605, and that ABB agreed to be bound by those terms. Consequently, ABB’s argument that it intended the reference to “tariffs” in its own document to carry no meaning is foreclosed by basic principles of Missouri contract law. See Celtic Corp., 254 S.W.3d at 143.
ABB concedes in its opening brief, “There is nothing ambiguous about the form language in the BOL.” Appellant’s Brief 47. Nonetheless, ABB argues that the court should not bind it to its unambiguous contract provision because ABB did not have actual knowledge of CSX’s effective tariff and because the provision at issue was outdated boilerplate language[9] —i.e., because ABB made a unilateral mistake in its drafting of the BOL, albeit one it has perpetuated on a routine basis for two decades. Yet ABB presents no evidence and makes no argument CSX knew or should have known of ABB’s “mistake.” Rather, ABB admits that it never had two-way communication with CSX and simply faxed the completed BOL to CSX and relied on CSX as its carrier for the shipment of the transformer. Upon CSX’s receiving the completed BOL that unambiguously stated on its face that ABB was aware of and accepted the terms of its effective tariff, CSX had no reason to believe that ABB, an experienced shipper, did not mean exactly what it stated in plain language on its own form. Thus, in the absence of any evidence of bad faith on the part of CSX, Missouri law prohibits ABB from avoiding the provision of its own BOL that it now finds unfavorable. See Kassebaum, 42 S.W.3d at 693.
The majority rejects the plain language interpretation of the BOL, arguing that under such an interpretation, “the shipper’s ‘knowledge’ of the [effective price] list could be proved solely by use of the generic and outdated word ‘tariff being employed as standard language in a bill of lading.” Majority Op. 143. Having already demonstrated that the term “tariff’ remains in common usage in the shipping *151 industry, see Sassy Doll, 331 F.3d at 841,1 also note that ABB did not simply make a general, passing reference to a “tariff” in the BOL. Instead, ABB certified, in binding contract language, that it was familiar with the terms of CSX’s tariff. That ABB now argues it did not actually have the knowledge it then claimed it had is simply no basis upon which to render meaningless the unambiguous, binding terms of its contract with CSX. ABB’s unilateral failure to draft its own contract with specificity should not allow it to later abandon terms that it, in hindsight, no longer finds favorable. As the Eleventh Circuit stated in Sassy Doll, the Court’s sympathy should “not go out to the drafter of a bill of lading who blames another party for the results that flow from defects in that document.” 331 F.3d at 843; see also Werner, 554 F.3d at 1328 (holding that courts should be “reluctant to protect a sophisticated shipper from itself when it drafts a shipping document”).
Ultimately, it is undisputed that ABB is “an experienced shipper[,] was not forced to employ [CSX],” and used its own BOL contract. Mech. Tech. Inc. v. Ryder Truck Lines, Inc., 776 F.2d 1085, 1088 (2d Cir.1985). It is therefore appropriate to bind ABB to its own choices, even if ABB now argues it made those choices by its own unilateral mistake. See Norton, 901 F.2d at 830 (“Carriers should not be held to a standard that would impose liability on them due to a unilateral mistake by an experienced shipper.”); see also Siren, 249 F.3d at 1272 (refusing to reform a shipping contract subject to the Carmack Amendment when the shipper made a unilateral mistake). As expressly contemplated in Siren, ABB “agree[d] in writing to a limitation of liability” by “preparing] a bill of lading which incorporate[d] [CSX’s] tariff by reference,” and CSX’s tariff “contain[ed] an applicable limitation of liability provision.” Siren, 249 F.3d at 1270.[10] As the Eleventh Circuit noted in Werner, “the [Carmack Amendment] requires nothing more than a valid written contract between the parties establishing a reasonable value for the purpose of limiting the liability of the carrier.” 554 F.3d at 1328 (quoting Siren, 249'F.3d at 1271.)
Ill
For all the foregoing reasons, I conclude that the BOL, incorporating Price List 4605 and its limitation on liability, fully complies with the Carmack Amendment as a “written agreement between the shipper and the carrier.” 49 U.S.C. § 11706(c)(3). I would therefore hold that the district court properly applied the Carmack Amendment exception for written agreements of limited liability and, thus, properly granted partial summary judgment to CSX. Accordingly, I respectfully dissent from the portion of Section III of the májority opinion regarding the majority’s interpretation of the BOL and from Section IV of the majority opinion. I would affirm the district court’s order granting CSX’s motion for partial summary judgment.

. For brevity and clarity, I adopt the same conventions as in the majority opinion. For example, I refer to the defendant as "CSX,” the plaintiff as "ABB,” and the Bill of Lading as "BOL.”

. The majority opinion states that Bruegge-man, ABB’s employee, attempted to retrieve the price list from CSX’s website without success. Majority Op. 141 & n. 13. Yet contrary to the majority opinion's recitation, Bruegge-man testified only that "I looked all over the website and tried to find a lot of different things and I do not ever remember seeing a price list that they made available on the website for me to go and look at.” J.A. 236. Brueggeman did not testify that the CSX website did not contain Price List 4605. The record contains no evidence contradicting CSX's claim that Price List 4605 was published and available on its website.

.The majority holds that the district court erred in concluding that the Carmack Amendment does not apply when the shipper has drafted the bill of lading. On this point, I *147 agree with the majority opinion; however, for the reasons stated herein, I would hold that ABB does not prevail under the Carmack Amendment.

. Prior to deregulation, courts held that a written agreement limiting liability was valid only if the carrier “maintain[ed] a tariff in compliance with the requirements of the Interstate Commerce Commission.” Hughes Aircraft Co. v. N. Am. Van Lines, Inc., 970 F.2d 609, 611 (9th Cir.1992). However, Congress eliminated the requirement that carriers file tariffs with the government in 1994. One-Beacon, 634 F.3d at 1099. Courts responded by holding that a carrier must provide its tariff to the shipper upon the shipper’s request. Id. at 1100.
ABB argues that Price List 4605 is not a "tariff” because the term "tariff” refers only to tariffs lawfully filed with the ICC prior to deregulation, rendering that term essentially meaningless in the deregulation era. Yet even after deregulation, rate schedules and price lists, such as Price List 4605, are still commonly referred to as tariffs. See, e.g., Sassy Doll Creations, Inc. v. Watkins Motor Lines, Inc., 331 F.3d 834, 841 (11th Cir.2003). As discussed more fully below, post-deregulation, a "tariff” and "schedule of rates” are equivalent terms in the contemporary trade.

. The Eleventh Circuit has provided that a carrier and shipper may effectively agree to a limitation on liability in compliance with the Carmack Amendment if, for example, "a) the carrier prepares a bill of lading which incorporates the carrier's tariff by reference, b) that tariff contains an applicable limitation of liability provision and c) the shipper agrees to and signs the bill of lading,” or if "the shipper ... prepare[s] a similar bill of lading that the parties agree to and sign.” Siren, Inc. v. Estes Express Lines, 249 F.3d 1268, 1270 (11th Cir.2001) (emphasis omitted).

. The majority opinion distinguishes Wemer on the basis that the contract between the shipper and the carrier suggested that certain third-party carriers could limit their liability by default and that full liability coverage was available only upon a specific written request. While the BOL in this case did not contain such a requirement on its face, it,did incorporate this requirement by reference to CSX's “tariff which governs the transportation of this shipment.” Moreover, even disregarding ABB's incorporation of CSX’s tariff by reference, ABB admits that it was familiar with CSX’s default policy of limited liability.

. The likely reason ABB did not pursue full liability coverage was the incompetence or negligence, or both, of Brueggeman, its agent. Nonetheless, the salient point for Carmack Amendment purposes is that ABB had the option to pursue full liability coverage and chose to ship its transformer without doing so.

. Price List 4605 also falls within the plain meaning of the term "classification,” which is defined as "a publication containing for the purpose of tariff assessment a list of articles, the classes to which they are assigned, and the rules and regulations governing the application of class rates.” Webster’s at 417. ABB presents no argument that Price List 4605 is not a classification.

. ABB emphasizes that the contract language at issue is boilerplate language. Yet neither ABB nor the majority opinion cite to any authority suggesting that boilerplate contract terms are somehow less binding than other contract terms, particularly when the party seeking rescission of those terms is the party that drafted them.

. The majority opinion rejects these cases, each of which apply the doctrine of unilateral mistake in the Carmack Amendment context, by stating, without citation to any authority, that the Carmack Amendment overrides standard principles of contract interpretation by “unambiguously impos[ing] the risk of error on one particular party, the carrier, to the exclusion of the other party, the shipper.” Majority Op. 145.