**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 12-1674

ABB INC.,

Plaintiff - Appellant,

v.

CSX TRANSPORTATION, INC.,

Defendant – Appellee,

------------------------------

TRANSPORTATION AND LOGISTICS COUNCIL, INC.,

Amicus Supporting Appellant.

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh.  James C. Fox, Senior District Judge.  (5:08-cv-00025-F)

Argued:  March 21, 2013                    Decided:  June 7, 2013

Before AGEE, KEENAN, and FLOYD, Circuit Judges.

Vacated in part and remanded by published opinion.  Judge Keenan wrote the opinion, in which Judge Floyd joined.  Judge Agee wrote a separate opinion concurring in part and dissenting in part.

**ARGUED:** Jeffrey Mark Young, ABB INC., Raleigh, North Carolina, for Appellant.  Hyman Hillenbrand, HILLENBRAND, O'BRIEN & SOLOMON, LLP, Fort Lauderdale, Florida, for Appellee.  **ON BRIEF:** Dauna L. Bartley, SESSOMS & ROGERS, P.A., Durham, North

Carolina, for Appellant. Thomas D. Garlitz, THOMAS D. GARLITZ, PLLC, Charlotte, North Carolina, for Appellee. Raymond A. Selvaggio, PEZOLD, SMITH, HIRSCHMANN & SELVAGGIO, LLC, Huntington, New York, for Amicus Supporting Appellant.

---

BARBARA MILANO KEENAN, Circuit Judge:

In March 2006, rail carrier CSX Transportation, Inc. (CSX) transported an electrical transformer worth about $1.3 million from shipper ABB Inc.'s plant in St. Louis, Missouri to a customer in Pittsburgh, Pennsylvania (the March 2006 shipment). ABB Inc. (ABB) later filed a complaint in the district court alleging that the transformer was damaged in transit, and that CSX was liable for over $550,000, the full amount of the damage. CSX denied full liability, and alternatively contended that even if the court found CSX liable for the cargo damage, the parties had agreed in the bill of lading to limit CSX's liability to a maximum of $25,000.

The district court held that the parties had limited CSX's potential liability in the bill of lading to $25,000. The parties thereafter entered into a consent judgment, reserving ABB's right to appeal the district court's resolution of the liability limit issue. Upon our review, we conclude that the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 11706, subjected CSX to full liability for the shipment, and that the parties did not modify CSX's level of liability by written agreement as permitted in that statute. We therefore vacate the portion of the district court's judgment limiting any liability on the part of CSX to $25,000.

3

I.

We begin with a discussion of the complex regulatory scheme governing interstate freight shipments, and the historical context in which the shipment in this case occurred. We also address the role of the Carmack Amendment, which restricts carriers' ability to limit their liability for cargo damage.

A.

In 1887, Congress enacted the Interstate Commerce Act (ICA), 24 Stat. 379, to regulate the transportation industry. Emerson Elec. Supply Co. v. Estes Express Lines Corp., 451 F.3d 179, 183 (3d Cir. 2006). The Interstate Commerce Commission (ICC) initially was designated to administer this regulatory regime, but was replaced in 1995 by the Surface Transportation Board. Id. at 183, 186; ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803, 932-34. Among other things, the ICC "regulated the railroad industry by requiring rates to be 'reasonable and just' and prohibited certain railroad practices, such as rate discrimination [and] price fixing," and eventually expanded to include the regulation of motor vehicle transportation. Emerson, 451 F.3d at 183.

Until 1995, carriers were required to file their rates, or "tariffs," publicly with the ICC. Tempel Steel Corp. v. Landstar Inway, Inc., 211 F.3d 1029, 1030 (7th Cir. 2000);

4

Comsource Indep. Foodserv. Cos. v. Union Pac. R.R., 102 F.3d 438, 442 (9th Cir. 1996). Under this scheme, "the filed rate govern[ed] the legal relationship between shipper and carrier," and the carrier could not deviate from the published tariff. Maislin Indus., U.S. v. Primary Steel, 497 U.S. 116, 119-20, 126 (1990). For these reasons, shippers and carriers generally were charged with notice of the terms that were required to be included in the carrier's published tariffs. See id. at 127 (citing Louisville & Nashville R.R. Co. v. Maxwell, 237 U.S. 94 (1915)).

In 1995, in an effort to ease regulatory burdens on the transportation industry, Congress abolished the requirement that tariffs be filed as public documents. ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803; Tempel Steel Corp., 211 F.3d at 1030. The term "tariff," even when still used by shippers and carriers "out of habit," is now merely a contractual term with "no effect apart from [its] status as [a] contract[]."[1] Tempel Steel Corp., 211 F.3d at 1030.

_____

[1] At the time of the 1995 deregulation, Congress imposed on rail carriers a new obligation to make their rates available to shippers, in lieu of the public-filing requirement. ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803, 830 (codified at 49 U.S.C. § 11101). Section 11101(b) provides:

> A rail carrier shall also provide to any person, on request, the carrier's rates and other service terms.
(Continued)

B.

The Carmack Amendment, 49 U.S.C. § 11706,[2] originally enacted in 1906 as an amendment to the ICA, "creates a national scheme of carrier liability for goods damaged or lost during interstate shipment under a valid bill of lading."[3]   5K Logistics, Inc. v. Daily Express, Inc., 659 F.3d 331, 335 (4th Cir. 2011) (citation and internal quotation marks omitted).   The statute requires that a rail carrier issue a bill of lading for property it transports, and that a carrier is liable to the "person entitled to recover" under the bill of lading "for the

_____

> The response by a rail carrier to a request for the carrier's rates and other service terms shall be—
>
> > (1) in writing and forwarded to the requesting person promptly after receipt of the request; or
> >
> > (2) promptly made available in electronic form.

[2] This appeal involves rail carriers, which are subject to the provisions of 49 U.S.C. § 11706.   Today, motor carriers are also subject to a separate provision of the Carmack Amendment, codified at 49 U.S.C. § 14706.

[3] A bill of lading "records that a carrier has received goods from the party that wishes to ship them, states the terms of carriage, and serves as evidence of the contract for carriage." Norfolk S. Ry. v. James N. Kirby, Pty Ltd., 543 U.S. 14, 18-19 (2004).

6

actual loss or injury to the property" caused by a carrier.[4]  49

U.S.C. § 11706(a).    The Carmack Amendment specifies that

"[f]ailure to issue a receipt or bill of lading does not affect

the liability of a rail carrier."  Id.

Subsection (c) of the statute provides only a limited

exception to full carrier liability:

> (1) A rail carrier may not limit or be exempt
> from liability imposed under subsection (a) of
> this section except as provided in this
> subsection.  A limitation of liability or of the
> amount of recovery or representation or agreement
> in a receipt, bill of lading, contract, or rule
> in violation of this section is void. . . .
>
> (3) A rail carrier providing transportation or
> service subject to the jurisdiction of the Board
> under this part may establish rates for
> transportation of property under which—
>
>> (A) the liability of the rail carrier for
>> such property is limited to a value
>> established by written declaration of the
>> shipper or by a written agreement between
>> the shipper and the carrier. . . .

49 U.S.C. § 11706(c) (emphasis added).    In other words, the

Carmack Amendment "constrains carriers' ability to limit

liability by contract," Kawasaki Kisen Kaisha Ltd. v. Regal-

Beloit Corp., 130 S. Ct. 2433, 2441 (2010), by requiring that a

---

[4] To establish a prima facie case of carrier liability under the Carmack Amendment, a shipper must show (1) delivery of the goods to the carrier in good condition; (2) the cargo's arrival in damaged condition; and (3) the amount of damages.  Oak Hall Cap & Gown Co. v. Old Dominion Freight Line, Inc., 899 F.2d 291, 294 (4th Cir. 1990).

7

rail carrier remains fully liable for damage caused to its freight unless the shipper has agreed otherwise in writing. 49 U.S.C. § 11706(a), (c); see also Emerson, 451 F.3d at 186 ("[A] carrier's ability to limit [its] liability is a carefully defined exception to the Carmack Amendment's general objective of imposing full liability for the loss of shipped goods.") (quoting Carmana Designs Ltd. v. N. Am. Van Lines, Inc., 943 F.2d 316, 319 (3d Cir. 1991)) (internal quotation marks omitted).[5] The Carmack Amendment thus protects shippers from attempts by carriers to avoid liability for damage to cargo under the carriers' control, and "relieve[s] cargo owners of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods." Kawasaki, 130 S. Ct. at 2441 (citation omitted).

To determine whether a carrier has limited its liability consistent with the strictures of the Carmack Amendment, courts

---

[5] In this opinion, we reference cases involving the transportation of goods by motor vehicles under Section 14706, as well as cases involving rail carriers under Section 11706. As relevant here, pursuant to Section 14706, motor carriers are by default liable for "the actual loss or injury to the property caused" by the carrier, but the carrier's liability may be limited "to a value established by written or electronic declaration of the shipper or by written agreement between the carrier and shipper if that value would be reasonable under the circumstances surrounding the transportation." 49 U.S.C. § 14706(a)(1), (c)(1)(A).

have applied a four-part test, under which carriers must: (1) provide the shipper, upon request, a copy of its rate schedule;[6] (2) "give the shipper a reasonable opportunity to choose between two or more levels of liability; (3) obtain the shipper's agreement as to his choice of carrier liability limit; and (4) issue a bill of lading prior to moving the shipment that reflects any such agreement." OneBeacon Ins. Co. v. Haas Indus., 634 F.3d 1092, 1099-1100 (9th Cir. 2011); see also Chandler v. Aero Mayflower Transit Co., 374 F.2d 129, 137 (4th Cir. 1967) (explaining the requirement of "reasonable notice" to choose between levels of liability). The Carmack Amendment's exception allowing for limited liability is "a very narrow exception to the general rule" imposing full liability on the carrier. Toledo Ticket Co. v. Roadway Express, 133 F.3d 439, 442 (6th Cir. 1998) (citing Carmack Amendment for motor carriers, as previously codified at 49 U.S.C. § 10730). Courts "will [] carefully scrutinize[]" any alleged limitation of liability "to assure that the shipper was given a meaningful choice and exercised it as evidenced by a writing." Acro

---

[6] Before deregulation, the first part of this test required that the carrier have maintained a tariff with the ICC. OneBeacon Ins. Co. v. Haas Indus., 634 F.3d 1092, 1099 (9th Cir. 2011) (citing Hughes Aircraft Co. v. N. Am. Van Lines, 970 F.2d 609, 611-12 (9th Cir. 1992)).

9

Automation Sys. v. Iscont Shipping, 706 F. Supp. 413, 416 (D. Md. 1989).

## II.

In its complaint filed against CSX, ABB alleged that CSX was liable for the "actual loss or injury arising from the damage to the [t]ransformer" under the Carmack Amendment. ABB also asserted state law claims for negligence and breach of contract.

CSX did not admit liability, but raised as an affirmative defense that any liability on its part was limited to a maximum of $25,000.[7] CSX argued that the bill of lading (BOL) executed by ABB had incorporated by reference a $25,000 liability limitation contained in a separate price list used by CSX.

The district court did not consider the issue whether ABB had established a prima facie case of liability against CSX but, on submissions by the parties, proceeded to consider the liability limitation issue. The court awarded summary judgment to CSX based on its defense that it had limited its liability. The court also reasoned that the Carmack Amendment did not apply to the shipment because the shipper, rather than the carrier,

---

[7] CSX also argued in the district court that the parties had entered into a private shipping contract governed by 49 U.S.C. § 10709, but assumed for purposes of summary judgment that the shipment was subject to the Carmack Amendment.

had drafted the BOL. Pursuant to the consent judgment entered into by the parties, ABB timely appealed from the district court's determination regarding CSX's limitation of liability.[8]

Before beginning our analysis of the Carmack Amendment, we describe the two documents central to our resolution of this appeal. First, the BOL governing the March 2006 shipment is a partially completed copy of ABB's standardized bill of lading. The BOL included general information about the shipment, such as the date of transport, pick-up and destination locations, and scheduled transportation route. In the space on the form labeled "product value," ABB's traffic manager, Brian Brueggeman, entered "$1,384,000." Although the box labeled "prepaid" (compared with "collect") was marked, the BOL did not include a price for the shipment or indicate the level of liability assumed by CSX for lost or damaged cargo.[9] The space labeled "rate authority" was left blank, as was the box that included the following pre-printed language:

_____

[8] The district court also dismissed ABB's state law claims, which decision is not at issue in this appeal.

[9] In his deposition testimony, Brueggeman stated that he thought that ABB would receive full liability coverage by declaring the value of the transformer in the body of the BOL, although he did not include a notation to this effect in the document.

11

NOTE – Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property.

The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding $___.[10]

The BOL also included certification language, which provided in part:

It is mutually agreed . . . that every service to be performed hereunder shall be subject to all the terms and conditions the Uniform Domestic Straight Bill of Lading set forth . . . in Uniform Freight Classification in effect on the date hereof, if this is a rail or a rail-water shipment . . .

Shipper hereby certifies that he is familiar with all the terms and conditions of the said bill of lading, including those on the back thereof, set forth in the classification or tariff which governs the transportation of this shipment, and the said terms and conditions are hereby agreed to by the shipper and accepted for himself and his assigns.

(emphasis added).[11]  The BOL was signed by Brueggeman.

The second document at issue in this appeal is CSX Price List 4605, which was "issued" by CSX on November 18, 2005 and became "effective" on December 14, 2005.  This twelve-page

---

[10]  ABB employees were unable to edit or enter any information into this "declared value box" due to a feature of the computer program.

[11]  In addition to the reference to a "tariff" in the certification, the following language appeared at the top of the BOL: "RECEIVED Subject to the Classifications and Lawfully filed tariffs in effect on the date of the issue of this Bill of Lading" (emphasis added).

document sets forth numerous rules applicable to CSX's transportation of machinery, such as, for example, procedures related to billing and to the loading and unloading of cargo. Relevant to this appeal is the section of Price List 4605 entitled "price restrictions." This section lists eighteen provisions, including the following:

> Carriers' maximum liability for lading loss or damage will not exceed $25,000 per shipment. Full liability coverage is only available by calling your sales representative for a specific quote.

CSX's corporate representative, Joseph McCauley, testified in his deposition that Price List 4605 does not provide varying rates associated with different levels of liability, and that in order to receive coverage for full liability under the list, a shipper must negotiate a rate directly with the carrier.

Neither Brueggeman nor his predecessor in ABB's traffic manager position, Craig Steffey, was aware of the existence of Price List 4605 prior to the March 2006 shipment. During his tenure, Steffey had obtained rate information from CSX by contacting the carrier directly and obtaining a quote specific to the intended shipment.

With respect to the March 2006 shipment at issue in this appeal, Brueggeman sought rate information on multiple occasions

13

without success from CSX personnel and from the CSX website,[12] and thus was unable to complete the space designated on the BOL for the "rate authority."[13]  Brueggeman explained that because he had been unable to obtain the rate authority in advance, he would only learn the price of the shipment when he eventually received an invoice from CSX.

III.

ABB argues that the district court erred in failing to apply the Carmack Amendment to ABB's shipment.  According to ABB, because the parties did not agree in writing to limit the carrier's liability, CSX is liable under the plain language of the Carmack Amendment for the full value of the cargo damage.

In response, CSX argues that ABB, as the drafter of the BOL, is not entitled to the protection of the Carmack Amendment

---

[12]  Although McCauley claimed that Price List 4605 was available on the CSX website, Brueggeman testified that he could not recall ever seeing a price list, despite "look[ing] all over the website."  In any event, it is undisputed that shippers could not request a full liability quote from CSX through the website.

[13]  At oral argument and in portions of its briefing, CSX appears to contest that Brueggeman attempted to obtain rate information for the shipment.  Yet elsewhere in its briefing, CSX acknowledges that Brueggeman consulted the CSX website and made inquiries to certain CSX personnel.  Despite CSX's allusions to the contrary, the record clearly indicates that Brueggeman affirmatively sought rate information from CSX, to no avail.

14

and that, regardless, the BOL incorporated by reference the limitation of liability included in Price List 4605.[14]  We disagree with CSX's arguments.

We nevertheless observe at the outset that ABB's problem in this case is partly of its own making.  The record reflects that Brueggeman did not exercise due diligence in performing a key aspect of his job, namely, negotiating and obtaining rate and liability information for the shipment of very expensive equipment.[15]  We also recognize that ABB could have prevented many of the problems that occurred in this case not only by properly negotiating the shipping rate, but also by revising its standardized bill of lading to exclude outdated references to "tariffs" and "classifications" that were part of the pre-1995 regulatory scheme.

Despite ABB's failures, however, the Carmack Amendment imposed the burden of securing limited liability on the carrier, CSX, not on the shipper, ABB.  49 U.S.C. § 11706; Acro Automation Sys., 706 F. Supp. at 416.  The plain language of the

---

[14] Based on the facts of this case, we are not confronted with a possible "written declaration of the shipper" as an exception to the imposition of full liability under the Carmack Amendment.  49 U.S.C. § 11706(c)(3)(A).  Accordingly, we address only the "written agreement" exception.  Id.

[15] We note that CSX's conduct also was culpable, given CSX's lack of accessibility to shippers over an extended period of time.

statute provides that in the absence of a clear, written agreement by the shipper, the carrier is subject to full liability for actual losses. See 49 U.S.C. § 11706(a), (c).

To overcome this default posture of full liability imposed by the Carmack Amendment, the carrier and the shipper must have a written agreement that is sufficiently specific to manifest that the shipper in fact agreed to a limitation of liability. "[A] carrier cannot limit liability by implication. There must be an absolute, deliberate and well-informed choice by the shipper." Acro Automation Sys., 706 F. Supp. at 416 (citation omitted). Without a rule requiring at least some specificity in a written agreement, the shipper would not have "a reasonable opportunity to choose between two or more levels of liability," OneBeacon Ins. Co., 634 F.3d at 1099, but instead would be automatically and unwittingly subject to the carrier's unilateral choice of a rate authority. Cf. N.Y., New Haven & Hartford R.R. Co. v. Nothnagle, 346 U.S. 128, 135-36 (1953) ("Binding [the shipper] by a limitation which [the shipper] had no reasonable opportunity to discover would effectively deprive [the shipper] of the requisite choice; such an arrangement would amount to a forbidden attempt to exonerate a carrier from the consequences of its own negligent acts.").

We disagree with the district court's conclusion that, as a general matter, the Carmack Amendment does not apply when the

16

shipper drafts the bill of lading.  The text of the Carmack Amendment imposes full liability on carriers, without regard to which party prepared the bill of lading.  The statute provides that a carrier's failure to issue a bill of lading "does not affect the liability of a rail carrier."  49 U.S.C. § 11706(a).

In this case, the parties did not reach a written agreement to limit CSX's liability and, accordingly, the Carmack Amendment operated to impose full liability on CSX.  On its face, the BOL governing the March 2006 shipment was silent regarding the extent of CSX's liability.  The space on the BOL labeled "rate authority," where a notation regarding rate and liability normally would be listed, was left blank.  Moreover, the BOL did not contain any references to an identifiable classification, a rate authority code, a price list, or any other indication that the carrier assumed only limited liability.

CSX contends, nonetheless, that Price List 4605 is incorporated by reference into the BOL through standardized language appearing on the BOL, indicating that the shipper agreed to the terms and conditions in "the classification or tariff which governs the transportation of this shipment."  In CSX's view, this standardized language is adequate to meet the "written agreement" exception for avoiding full liability under the Carmack Amendment.

17

We cannot endorse CSX's position urging limited liability under these circumstances, because the language in the BOL does not specifically reference Price List 4605. Under CSX's proposed rule, shippers would be charged with notice of a private price list created by the carrier, even when the list was not filed for public inspection, the shipper had not previously shipped cargo pursuant to that list, and the shipper had sought the pricing information unsuccessfully from the carrier before drafting the BOL. Under such a theory, the shipper's "knowledge" of the list could be proved solely by use of the generic and outdated word "tariff" being employed as standard language in a bill of lading.

Prior to deregulation, courts reasonably held shippers to constructive knowledge of a published tariff based on a generic reference to the tariff in a bill of lading. See Mech. Tech. Inc., v. Ryder Truck Lines, Inc., 776 F.2d 1085, 1087-89 (2d Cir. 1985). Today, however, carriers are not required to file such public tariffs. Tempel Steel Corp., 211 F.3d at 1030. To permit a carrier to assume that a shipper is familiar with a carrier's price list, without any manifestation of that familiarity in the bill of lading or in an external agreement limiting the carrier's liability, would be contrary to the Carmack Amendment's command that a carrier may only limit

18

liability pursuant to an express, written agreement with the shipper. 49 U.S.C. § 11706(c).

Extended to its logical extreme, CSX's proposed rule would encourage absurd results. One such example would be a situation in which the bill of lading references a general "tariff," but does not specify a particular rate authority or other code indicating the applicable rate and liability level. In the absence of publicly filed tariffs, or a citation to a specific rate authority or code, a carrier could change unilaterally its level of liability, unbeknownst to the shipper, by altering its price list a day before the shipment takes place.

Additionally, we observe that a decision in favor of CSX would be required if Price List 4605 had been referenced specifically in the BOL, even if ABB had not actually been aware of the limitation of liability contained in that price list. In such a circumstance, the shipper reasonably would be charged with notice of the meaning of a precise, currently applicable term that the shipper included in the BOL.

The Eleventh Circuit's decision in Siren, Inc. v. Estes Express Lines, 249 F.3d 1268 (11th Cir. 2001), on which the district court and CSX have relied, is distinguishable on this basis. In Siren, the shipper prepared the bill of lading and noted twice that the shipment would move under "Class 85," a term understood in the trucking industry as limiting liability

19

to a certain amount per pound of cargo, although the shipper maintained it had no actual knowledge that this class designation provided such a limitation of liability. 249 F.3d at 1269, 1272. Nevertheless, the shipper was aware that it had received a significant discount from the carrier's full liability rate for the shipment in question, and that the rate it received was based on the "Class 85" designation. Id. The Eleventh Circuit concluded that, because "[the shipper] drafted the bill of lading, [the shipper] chose to use the term 'Class 85', [the shipper] did not rebut [the carrier's] assertion at trial that 'Class 85' included a limiting aspect, [the shipper] knew 'Class 85' determined the freight rate charged, and [the shipper] knew that it received a 62% discount from [the] full freight rate," the shipper could not avoid the limitation of liability it had included in the contract, because it was not "proper or necessary to protect shippers from themselves." Id. at 1271, 1273.

We agree with the Eleventh Circuit's determination that, by including a specific class designation in the bill of lading, the shipper was bound to the terms and conditions associated with that class designation. Cf. Hughes Aircraft Co. v. N. Am. Van Lines, Inc., 970 F.2d 609, 612 (9th Cir. 1992) (holding that a shipper had "reasonable notice and an opportunity to make a deliberate, thoughtful choice in selecting" a limit of liability

20

when the shipper drafted the bill of lading and negotiated its terms). In the present case, however, the BOL is entirely silent regarding any current rate, classification, or other specific authority governing the shipment. There also is no evidence that the parties had a written agreement establishing a limit of liability separate from the BOL. Therefore, as discussed above, we decline to conclude that a shipper should be held to notice of a privately held price list based only on generic and ambiguous language referencing a "tariff" or "classification."[16]

Our conclusion that the parties did not agree to a liability limitation is not altered by CSX's reliance on its

---

[16] We disagree with the dissent's contention that the facts of this case are "indistinguishable" from the facts in Werner Enters. v. Westwind Mar. Int'l, Inc., 554 F.3d 1319 (11th Cir. 2009). Post at 30-32. In Werner, the invoice for the shipment expressly notified the shipper of the potential for a limitation of liability. The invoice provided:

> Third parties to whom the goods are entrusted may limit liability for loss or damage; the Company will request excess valuation coverage only upon specific written instructions from the Customer, which must agree to pay any charges therefore; in the absence of written instructions or the refusal of the third party to agree to a higher declared value, at Company's discretion, the goods may be tendered to the third party, subject to the terms of the third party's limitations of liability and/or terms and conditions of service.

554 F.3d at 1322. In the present case, however, the BOL did not contain any such limiting language. In light of this material distinction, we conclude that Werner is inapposite.

past course of dealing with ABB. The Carmack Amendment's requirement of a written agreement undermines CSX's argument that the parties' alleged course of dealing can serve as a substitute for a written limitation of liability for a particular shipment. See Mooney v. Farrell Lines, Inc., 616 F.2d 619, 626 (2d Cir. 1980) (declining to limit a carrier's liability by evidence of the parties' course of dealing, when the liability limit was not included in the bill of lading); cf. Camar Corp. v. Preston Trucking Co., 18 F. Supp. 2d 112, 115 (D. Mass. 1998) (rejecting argument that the shipper's sophistication and the parties' course of dealing evidenced an "absolute, deliberate and well-informed choice by the shipper" to limit the carrier's liability, in the absence of a bill of lading or other written agreement).

Moreover, the present record lacks any evidence that ABB previously had shipped under the terms of Price List 4605, or otherwise was familiar with that list. Of the seventy-three total bills of lading pre-dating March 2006 in the record, none references Price List 4605. Indeed, Price List 4605 was issued in November 2005 and became effective in December 2005, only three months before the shipment at issue in this case, and there is no evidence that ABB shipped any cargo pursuant to that list in the interim three-month period.

Of the nine ABB-CSX bills of lading included in the record, several different rate authority codes were used, and the record contains no evidence regarding the limits of liability associated with those codes.[17] Steffey, Brueggeman's predecessor in the traffic manager position, testified that he entered these rate authorities on the bills of lading after being instructed to do so by CSX representatives with whom he had negotiated rates for particular shipments, not because he was generally familiar with CSX price lists. Counsel for CSX also conceded at oral argument that CSX's price lists are regularly changing, further undermining the contention that ABB should have been familiar with Price List 4605 at the time of the shipment.[18]

We appreciate the common sense observation that a shipper drafting an imprecise bill of lading should not stand to benefit from its own lack of precision, as well as the district court's reflection that such a shipper need not be protected from

---

[17] On one of the ABB-CSX bills of lading, Steffey included the notation "FULL LIABILITY REQUIRED!!!," at the direction of a CSX marketing representative.

[18] The dissent broadly asserts that ABB has admitted that in its past dealings with CSX, it "always had to expressly request full liability coverage in order to receive it." Post at 32. We do not discuss the evidence underlying this broad assertion, because any alleged course of dealing prior to CSX's implementation of Price List 4605 does not bear on the question whether the parties had memorialized in writing an agreement that the March 2006 shipment would proceed under Price List 4605.

itself. Nevertheless, we are bound by the express language of the Carmack Amendment, which puts the burden on the carrier to demonstrate that the parties had a written agreement to limit the carrier's liability, irrespective whether the shipper drafted the bill of lading. See 49 U.S.C. § 11706(a), (c). The general contract principle that ambiguous contracts be construed against the drafter, see, e.g., Wheeler v. Dynamic Eng'g, 62 F.3d 634, 638 (4th Cir. 1995), is inapplicable in the face of statutory language that unambiguously imposes the risk of error on one particular party, the carrier, to the exclusion of the other party, the shipper.[19]

Finally, we note that important practical considerations support the conclusion we reach today. Shippers by necessity entrust rail carriers with the safekeeping of expensive cargo and, under the Carmack Amendment, are entitled to presume that carriers will be held fully responsible for damage incurred during transit unless otherwise agreed. Our ruling encourages parties to employ precise bills of lading, which reflect fully and specifically the parties' choice of liability terms, and to

---

[19] For the same reason, we disagree with the dissent's reliance on the state law principle that a unilateral mistake does not justify rescission of a contract under the circumstances of this case. Post at 35 (citing Kassebaum v. Kassebaum, 42 S.W.3d 685, 693 (Mo. Ct. App. 2001)).

24

memorialize these terms in writing as Congress intended by passage of the Carmack Amendment.  See 49 U.S.C. § 11706.

IV.

In sum, we conclude that the district court erred in awarding summary judgment in favor of CSX on its claimed liability limitation of $25,000.  We therefore vacate the portion of the district court's judgment fixing that liability limitation and remand the case for further proceedings consistent with this opinion.

VACATED IN PART AND REMANDED

25

AGEE, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority opinion except as to those parts of Sections III and IV that conclude that the district court improperly granted CSX's[1] motion for partial summary judgment. In my view, both the record and circuit precedent support the grant of partial summary judgment in favor of CSX. Accordingly, I respectfully dissent as to the above-noted parts of the majority opinion.

I

As a preliminary matter, the BOL in the transaction at issue was drafted by ABB, the shipper, on its own standardized form. The BOL clearly stated,

> Shipper hereby certifies that he is familiar with all the terms and conditions of the said bill of lading, including those on the back thereof, set forth in the classification or tariff which governs the transportation of this shipment, and the said terms and conditions are hereby agreed to by the shipper and accepted for himself and his assigns.

J.A. 121.

CSX's effective rate schedule at the time of the shipment, Price List 4605, clearly stated, "Carriers' maximum liability for

---

[1] For brevity and clarity, I adopt the same conventions as in the majority opinion. For example, I refer to the defendant as "CSX," the plaintiff as "ABB," and the Bill of Lading as "BOL."

lading loss or damage will not exceed $25,000 per shipment. Full liability coverage is only available by calling your sales representative for a specific quote." J.A. 117.

Although ABB employees testified that they were not aware of Price List 4605 prior to drafting the BOL, CSX employees testified that Price List 4605 was published on the CSX company website and was available upon request from any of its sales representatives. ABB does not dispute that Price List 4605 was available on CSX's company website. ABB merely asserts that its employees attempted to contact CSX to obtain a price quote, but had no success in receiving rate information by telephone.[2] Despite its inability to receive price information from CSX, ABB still chose to ship a $1.384 million transformer using CSX as the carrier.

II

A

---

[2] The majority opinion states that Brueggeman, ABB's employee, attempted to retrieve the price list from CSX's website without success. Majority Op. 14 & n.13. Yet contrary to the majority opinion's recitation, Brueggeman testified only that "I looked all over the website and tried to find a lot of different things and I do not ever remember seeing a price list that they made available on the website for me to go and look at." J.A. 236. Brueggeman did not testify that the CSX website did not contain Price List 4605. The record contains no evidence contradicting CSX's claim that Price List 4605 was published and available on its website.

The majority holds that "the parties did not reach a written agreement to limit CSX's liability and, accordingly, the Carmack Amendment operated to impose full liability on CSX." Majority Op. 17.[3] On this point, we disagree. The record shows that the parties made such a written agreement and that the agreement complies with the requirements of the Carmack Amendment and limits CSX's liability.

The Carmack Amendment allows a commercial rail carrier to limit its liability with the shipper's written consent.

> A rail carrier providing transportation or service subject to the jurisdiction of the Board under this part may establish rates for transportation of property under which—
>
> (A) the liability of the rail carrier for such property is limited to a value established by written declaration of the shipper or by a written agreement between the shipper and the carrier; or
>
> (B) specified amounts are deducted, pursuant to a written agreement between the shipper and the carrier, from any claim against the carrier with respect to the transportation of such property.

49 U.S.C. § 11706(c)(3).

Courts determine whether such written consent is effective under the Carmack Amendment by considering whether the carrier

---

[3] The majority holds that the district court erred in concluding that the Carmack Amendment does not apply when the shipper has drafted the bill of lading. On this point, I agree with the majority opinion; however, for the reasons stated herein, I would hold that ABB does not prevail under the Carmack Amendment.

(1) provided a tariff to the shipper upon the shipper's request,[4] (2) "gave the shipper a reasonable opportunity to choose between two or more levels of liability" (at least one of which was full liability coverage), (3) "obtain[ed the] shipper's agreement as to his choice of carrier liability," and (4) "issue[d] a bill of lading prior to moving the shipment." See OneBeacon Ins. Co. v. Haas Indus., Inc., 634 F.3d 1092, 1099–1100 (9th Cir. 2011).[5]

---

[4] Prior to deregulation, courts held that a written agreement limiting liability was valid only if the carrier "maintain[ed] a tariff in compliance with the requirements of the Interstate Commerce Commission." Hughes Aircraft Co. v. N. Am. Van Lines, Inc., 970 F.2d 609, 611 (9th Cir. 1992). However, Congress eliminated the requirement that carriers file tariffs with the government in 1994. OneBeacon, 634 F.3d at 1099. Courts responded by holding that a carrier must provide its tariff to the shipper upon the shipper's request. Id. at 1100.

ABB argues that Price List 4605 is not a "tariff" because the term "tariff" refers only to tariffs lawfully filed with the ICC prior to deregulation, rendering that term essentially meaningless in the deregulation era. Yet even after deregulation, rate schedules and price lists, such as Price List 4605, are still commonly referred to as tariffs. See, e.g., Sassy Doll Creations, Inc. v. Watkins Motor Lines, Inc., 331 F.3d 834, 841 (11th Cir. 2003). As discussed more fully below, post-deregulation, a "tariff" and "schedule of rates" are equivalent terms in the contemporary trade.

[5] The Eleventh Circuit has provided that a carrier and shipper may effectively agree to a limitation on liability in compliance with the Carmack Amendment if, for example, "a) the carrier prepares a bill of lading which incorporates the carrier's tariff by reference, b) that tariff contains an applicable limitation of liability provision and c) the shipper agrees to and signs the bill of lading," or if "the shipper . . . prepare[s] a similar bill of lading that the parties agree to and sign." Siren, Inc. v. Estes Express Lines, 249 F.3d 1268, 1270 (11th Cir. 2001) (emphasis omitted).

Two of the above requirements are easily disposed of. As to the first requirement, ABB does not dispute that CSX never, in fact, received a request for its rates or tariff from ABB. While ABB asserts that it made several telephone calls to CSX that went unreturned, ABB presented no evidence that it ever made actual contact with an authorized CSX agent to request CSX's rate information. Nor does ABB present any evidence to rebut CSX's testimony that its rate information was available on its website. And courts have concluded that the fourth requirement, that a carrier issue a bill of lading prior to shipment, is also satisfied when the shipper prepares the bill of lading. See, e.g., Siren, Inc. v. Estes Express Lines, 249 F.3d 1268, 1273 (11th Cir. 2001). Thus, at issue in this case is only whether ABB had a reasonable opportunity to choose between two or more levels of liability and whether ABB agreed in writing to limited liability on the part of CSX.

The record reflects that CSX provided ABB with a reasonable opportunity to choose between different levels of liability coverage. The facts of this case seem indistinguishable from those in Werner Enterprises v. Westwind Maritime International, Inc.[6] In Werner, the Eleventh Circuit considered whether a

---

[6] The majority opinion distinguishes Werner on the basis that the contract between the shipper and the carrier suggested that certain third-party carriers could limit their liability by
(Continued)

30

shipper was given a reasonable opportunity to elect full liability coverage when the shipping document incorporated by reference the carrier's tariff, which contained a $200,000 limitation on liability. 554 F.3d 1319, 1328 (11th Cir. 2009). Notably, the tariff at issue in Werner instructed a shipper to specifically notify the carrier when it wanted full liability coverage. Id. As in the case at bar, the shipper in Werner never expressly requested full liability coverage from the carrier. Id. at 1323. The shipper in Werner argued that it did not have a meaningful opportunity to request full liability coverage because the carrier's default coverage was limited. Id. at 1327. Faced with this argument, the Eleventh Circuit held that the carrier properly limited its liability within the requirements of the Carmack Amendment because it provided the shipper with the right to request full liability coverage. Id.

ABB makes the same argument rejected by the Eleventh Circuit in Werner—that CSX's default policy of limited liability deprived it of a reasonable opportunity to choose full liability

---

default and that full liability coverage was available only upon a specific written request. While the BOL in this case did not contain such a requirement on its face, it did incorporate this requirement by reference to CSX's "tariff which governs the transportation of this shipment." Moreover, even disregarding ABB's incorporation of CSX's tariff by reference, ABB admits that it was familiar with CSX's default policy of limited liability.

coverage. Yet like the carrier in Werner, CSX merely reserved "the right to approve the request [for full liability coverage] and charge a correspondingly higher rate." Id. CSX's effective tariff, Price List 4605, incorporated by reference in the BOL, provided shippers with the right to elect full liability coverage.

Although ABB argues that it was not aware of Price List 4605, it is undisputed that CSX's policy requiring its shippers to affirmatively request full liability coverage was not new to Price List 4605 and was not a change in policy from prior dealings between CSX and ABB. In fact, ABB admits that in its past dealings with CSX as well as other carriers, it always had to expressly request full liability coverage in order to receive it and that it was aware that rail carriers limited their liability to amounts as low as $25,000 prior to the shipment at issue. It is therefore easy to conclude that, as in Werner, CSX provided ABB with a reasonable opportunity to elect full liability coverage, an opportunity ABB chose not to avail itself of for reasons known only to ABB.[7]

This conclusion is further supported by the fact that ABB

---

[7] The likely reason ABB did not pursue full liability coverage was the incompetence or negligence, or both, of Brueggeman, its agent. Nonetheless, the salient point for Carmack Amendment purposes is that ABB had the option to pursue full liability coverage and chose to ship its transformer without doing so.

drafted the BOL in this case. ABB argues at length that various problems with ABB's own BOL deprived it of a reasonable opportunity to choose full liability coverage. Among other things, ABB argues that its form bill of lading would not allow the employee filling it out to enter a value in the "declared value" box of the form. ABB's entire line of argument, however, completely ignores the fact that ABB created the bill of lading form and tendered it as a contract to CSX. While a carrier may not require a shipper to use a form that deprives the shipper of a reasonable opportunity to request full liability coverage, any defects in a form created by a shipper are "no more than a unilateral mistake" that cannot later be used against a carrier. Sassy Doll, 331 F.3d at 842; see Werner, 554 F.3d at 1328 (stating that, while rejecting a similar claim, the court was "particularly persuaded by the fact that the shipper drafted the bill of lading."); Norton v. Jim Phillips Horse Transp., Inc., 901 F.2d 821, 830 (10th Cir. 1989) ("Carriers should not be held to a standard that would impose liability on them due to a unilateral mistake by an experienced shipper."); Hughes v. United Van Lines, Inc., 829 F.2d 1407, 1418–19 (7th Cir. 1987) ("[O]nce the shipper was aware that the document signed was a contract for transporting his goods, absent fraud or bad faith, the shipper cannot reform the bill of lading without the consent of the carrier on the grounds that they were unilaterally

33

mistaken about the terms of the contract."). ABB cannot rely on its own negligence in introducing its own defective document into the commercial marketplace to avoid the resulting consequences of its contractual covenants. Nothing in the Carmack Amendment requires the carrier to hold the shipper harmless for the shipper's negligence, particularly where the carrier has every reason to take the shipper at its word.

Moreover, ABB agreed in writing to CSX's limitation on liability. On its face, the BOL unambiguously incorporated CSX's effective tariff, which was Price List 4605, and therefore functioned to limit CSX's liability in accordance with the Carmack Amendment. Specifically, ABB certified that it was "familiar with all the terms and conditions . . . set forth in the classification or tariff which governs the transportation of this shipment" and that it agreed to be bound by those terms and conditions. J.A. 121. The majority opinion treats this unambiguous, binding contract language as inoperative, however, because (1) the reference to the "tariff which governs the transportation of this shipment" is generic boilerplate language and (2) the BOL does not specifically mention Price List 4605.

ABB concedes that the BOL is a valid, binding contract between the parties. The Court must therefore read that contract consistently with the applicable contract law of the state in which the contract was formed. See CTI/DC, Inc. v. Selective

34

<u>Ins. Co. of Am.</u>, 392 F.3d 114, 118 (4th Cir. 2004). Because ABB asserts that the contract was formed in Missouri and CSX does not argue otherwise on appeal, we apply Missouri law.

Under Missouri law, the parol evidence rule bars courts from considering whether a party to a contract may have "intended anything other than what was written" in the contract document. <u>See</u> <u>Celtic Corp. v. Tinnea</u>, 254 S.W.3d 137, 143 (Mo. Ct. App. 2008). One party's unilateral mistake cannot serve as the basis of rescission under Missouri law unless the mistake related to a material fact and the other party to the contract knew or should have known of the mistake. <u>See</u> <u>Kassebaum v. Kassebaum</u>, 42 S.W.3d 685, 693 (Mo. Ct. App. 2001).

ABB argues that the contract language is unenforceable as written because the term "tariff" refers only to tariffs lawfully filed with the ICC prior to deregulation, rendering that term essentially meaningless in the ensuing 20 years of the deregulation era. Yet even after deregulation, rate schedules and price lists, such as Price List 4605, are still commonly, if not uniformly, referred to as tariffs. <u>See, e.g.</u>, <u>Werner</u>, 554 F.3d at 1328 (referring to the carrier's post-deregulation shipping document as a "tariff"); <u>Sassy Doll</u>, 331 F.3d at 841 (holding that, in the deregulation era, "a carrier is now required to provide a shipper with the carrier's tariff if the shipper requests it, instead of the shipper filing its tariff

35

with the now-defunct ICC"). Moreover, Price List 4605 clearly falls within the plain meaning of the term "tariff," which is defined as "a listing or scale of rates or charges for a business or a public utility."[8] Webster's Third New International Dictionary 2341 (2002). Thus, the BOL plainly and unambiguously stated on its face that ABB was familiar with the terms and conditions of CSX's effective tariff, which was Price List 4605, and that ABB agreed to be bound by those terms. Consequently, ABB's argument that it intended the reference to "tariffs" in its own document to carry no meaning is foreclosed by basic principles of Missouri contract law. See Celtic Corp., 254 S.W.3d at 143.

ABB concedes in its opening brief, "There is nothing ambiguous about the form language in the BOL." Appellant's Brief 47. Nonetheless, ABB argues that the court should not bind it to its unambiguous contract provision because ABB did not have actual knowledge of CSX's effective tariff and because the provision at issue was outdated boilerplate language[9]—i.e.,

---

[8] Price List 4605 also falls within the plain meaning of the term "classification," which is defined as "a publication containing for the purpose of tariff assessment a list of articles, the classes to which they are assigned, and the rules and regulations governing the application of class rates." Webster's at 417. ABB presents no argument that Price List 4605 is not a classification.

[9] ABB emphasizes that the contract language at issue is boilerplate language. Yet neither ABB nor the majority opinion (Continued)

36

because ABB made a unilateral mistake in its drafting of the BOL, albeit one it has perpetuated on a routine basis for two decades. Yet ABB presents no evidence and makes no argument CSX knew or should have known of ABB's "mistake." Rather, ABB admits that it never had two-way communication with CSX and simply faxed the completed BOL to CSX and relied on CSX as its carrier for the shipment of the transformer. Upon CSX's receiving the completed BOL that unambiguously stated on its face that ABB was aware of and accepted the terms of its effective tariff, CSX had no reason to believe that ABB, an experienced shipper, did not mean exactly what it stated in plain language on its own form. Thus, in the absence of any evidence of bad faith on the part of CSX, Missouri law prohibits ABB from avoiding the provision of its own BOL that it now finds unfavorable. See Kassebaum, 42 S.W.3d at 693.

The majority rejects the plain language interpretation of the BOL, arguing that under such an interpretation, "the shipper's 'knowledge' of the [effective price] list could be proved solely by use of the generic and outdated word 'tariff' being employed as standard language in a bill of lading."

cite to any authority suggesting that boilerplate contract terms are somehow less binding than other contract terms, particularly when the party seeking rescission of those terms is the party that drafted them.

37

Majority Op. 18. Having already demonstrated that the term "tariff" remains in common usage in the shipping industry, see Sassy Doll, 331 F.3d at 841, I also note that ABB did not simply make a general, passing reference to a "tariff" in the BOL. Instead, ABB certified, in binding contract language, that it was familiar with the terms of CSX's tariff. That ABB now argues it did not actually have the knowledge it then claimed it had is simply no basis upon which to render meaningless the unambiguous, binding terms of its contract with CSX. ABB's unilateral failure to draft its own contract with specificity should not allow it to later abandon terms that it, in hindsight, no longer finds favorable. As the Eleventh Circuit stated in Sassy Doll, the Court's sympathy should "not go out to the drafter of a bill of lading who blames another party for the results that flow from defects in that document." 331 F.3d at 843; see also Werner, 554 F.3d at 1328 (holding that courts should be "reluctant to protect a sophisticated shipper from itself when it drafts a shipping document").

Ultimately, it is undisputed that ABB is "an experienced shipper[,] was not forced to employ [CSX]," and used its own BOL contract. Mech. Tech. Inc. v. Ryder Truck Lines, Inc., 776 F.2d 1085, 1088 (2d Cir. 1985). It is therefore appropriate to bind ABB to its own choices, even if ABB now argues it made those choices by its own unilateral mistake. See Norton, 901 F.2d at

38

830 ("Carriers should not be held to a standard that would impose liability on them due to a unilateral mistake by an experienced shipper."); see also Siren, 249 F.3d at 1272 (refusing to reform a shipping contract subject to the Carmack Amendment when the shipper made a unilateral mistake). As expressly contemplated in Siren, ABB "agree[d] in writing to a limitation of liability" by "prepar[ing] a bill of lading which incorporate[d] [CSX's] tariff by reference," and CSX's tariff "contain[ed] an applicable limitation of liability provision." Siren, 249 F.3d at 1270.[10] As the Eleventh Circuit noted in Werner, "the [Carmack Amendment] requires nothing more than a valid written contract between the parties establishing a reasonable value for the purpose of limiting the liability of the carrier." 554 F.3d at 1328 (quoting Siren, 249 F.3d at 1271.)

III

For all the foregoing reasons, I conclude that the BOL, incorporating Price List 4605 and its limitation on liability,

---

[10] The majority opinion rejects these cases, each of which apply the doctrine of unilateral mistake in the Carmack Amendment context, by stating, without citation to any authority, that the Carmack Amendment overrides standard principles of contract interpretation by "unambiguously impos[ing] the risk of error on one particular party, the carrier, to the exclusion of the other party, the shipper." Majority Op. 24.

fully complies with the Carmack Amendment as a "written agreement between the shipper and the carrier." 49 U.S.C. § 11706(c)(3). I would therefore hold that the district court properly applied the Carmack Amendment exception for written agreements of limited liability and, thus, properly granted partial summary judgment to CSX. Accordingly, I respectfully dissent from the portion of Section III of the majority opinion regarding the majority's interpretation of the BOL and from Section IV of the majority opinion. I would affirm the district court's order granting CSX's motion for partial summary judgment.